CHARLES A. KEATING, Appellant, v. WILLIAM H. KEATING, Appellee.

**TRUSTS:** Enforcement of Trust—Discretion—Power of Court to Review. Equity never loses its power to review the exercise, by trustees, of the discretion conferred upon them by the trust instrument as to the manner in which they shall execute the trust, and to correct any arbitrary and unreasonable exercise of such discretion, even though the trust instrument attempts to prevent such interference by the courts, and to repose the exercise of such discretion wholly in the trustee.

PRINCIPLE APPLIED: A father, by will, created a specific trust for the use and benefit of his youngest son. To carry out the trust, the father devised a farm to his eldest son in fee. The devise provided that the youngest son should be provided for out of the income of the farm during his lifetime, and contained this clause:

"Should my said [youngest] son * * * survive me and he prove to be a careful and prudent man, then it is my desire, *if my trustee think best*, that * * * my said trustee shall convey * * * the title of all of said real estate, in fee simple, to my said [youngest] son. But I hereby expressly declare that my said trustee shall not be required to convey said real estate under *any* condition, *or order of court*, except as *he* may deem for the best interest of my said [youngest]· son."

Other provisions reinforced the idea of unlimited discretion in the trustee. The devise provided that, if no conveyance was ever made to the youngest son, then the trustee should be absolute owner of the property. This trustee was an attorney, and *drew the will.*

The *cestui que trust* survived the father, and for some twenty years the eldest son carried out the trust. The beneficiary then demanded that the trust be terminated, and that he receive a conveyance of the property. The trustee refused, asserting that the beneficiary was not a "careful and prudent" man, and taking the position that *his* discretion to decide the question was subject to no control—not even by the courts. The trustee was even proposing to convey the property to other relatives, subject to the life interest of the youngest son. These opposing views resulted in much hostile feeling between the two brothers.

The beneficiary, in an action to enforce his demands, proved that he was, in fact, a reasonably "careful and prudent man."

*Held:*

1. That equity had power to review the exercise of the discretion conferred upon the trustee.

2. That the instrument would not be construed as authorizing an unreasonable and arbitrary exercise of discretion.

3. That the *"desire"* expressed by the testator was not precatory, but mandatory.

4. That the attitude of the trustee as to his rights under the trust was so antagonistic to the interests of the *cestui que trust* as to demand the removal of the trustee.

5. That the bitter personal hostility between the brothers, growing out of the trustee's attitude, was sufficient to justify the removal of the trustee.

6. That the *cestui que trust* was entitled to an order terminating the trust, and to a conveyance of the property in fee.

**TRUSTS:** Construction and Operation—Uncontrolled Discretion. A construction of an instrument of trust which would enable a trustee to personally profit by an arbitrary and unreasonable exercise of discretion on his part will, if in any degree doubt-

ful, be rejected, when said trust instrument *was drawn by the trustee himself as the trusted adviser of the trustor.*

PRINCIPLE APPLIED:   See No. 1.

**WILLS:** Construction—Nature of Estate Created—Separation of
3 Legal and Equitable Estate. Principle recognized that the de-
vise of real property to one person for the express use and
benefit of another person works a vesting of the legal title in
the trustee and the equitable title in the *cestui que trust.*

PRINCIPLE APPLIED:   See No. 1.

**WILLS:** Construction—Precatory Words Used in Mandatory Sense.
4 Words which are wholly precatory when standing alone may.
become mandatory when, in the quest for the intent, the entire
language of the instrument and the attending circumstances
are considered.

PRINCIPLE APPLIED:   See No. 1.

**TRUSTS:** Tenure of Trustee—Removal—Grounds. Ground for re-
5 moval of a trustee is found in the active assertion by the trus-
tee of rights to the trust property which are destructive of the
trust, or otherwise antagonistic to the rights and interests of
the *cestui que trust.*

PRINCIPLE APPLIED:   See No. 1.

**TRUSTS:** Tenure of Trustee—Removal—Grounds. Personal hostil-
6 ity between a trustee and the *cestui que trust*, who are neces-
sarily, in the execution of the trust, brought into close, person-
al intercourse, may, when the *cestui* is without fault, be ground
for the removal of the trustee.

PRINCIPLE APPLIED:   See No. 1.

**TRUSTS:** Management—Allowance of Attorney Fees Out of Trust
7 Fund. An order requiring a trustee, as such, to pay the attor-
neys of the *cestui que trust* stated attorney fees for services
in compelling an enforcement of the trust, will not be disturbed
on an appeal wherein the merits are held to be wholly with
the *cestui que trust.*

*Appeal from Mahaska· District Court.*—JOHN F. TALBOTT,
Judge.

NOVEMBER 17, 1917

REHEARING DENIED FEBRUARY 15, 1918.

ACTION in equity to remove trustee, and for an accounting. There was a decree for the defendant, and plaintiff appeals.—*Affirmed on defendant's appeal; reversed on plaintiff's appeal.*

*Henry & Henry,* for appellant.

*McCoy & McCoy* and *W. H. Keating,* for appellee.

1. TRUSTS: enforcement of trust: discretion: power of court to review.

WEAVER, J.—William Keating, a resident of Mahaska County, Iowa, died in the year 1894, survived by several children, among whom the eldest, William H. Keating, was a practicing lawyer, and the youngest, Charles A. Keating, was at that time residing at home with his father. A few months before his death, he made a will. The instrument was prepared and drawn by his son William H. Keating. In one of the opening clauses of the will, the testator says, in substance, that he has already made what he deems suitable provision for his children other than Charles, and then proceeds with a devise for his benefit, in words as follows:

"Third. I give, devise and bequeath to my son, W. H. Keating, in trust the following described real estate, [describing a 120-acre tract of land] for the benefit of my son, Charles A. Keating, should he survive me, but should I survive him, then said real estate to vest in fee simple in my said son, W. H. Keating, after the payment of debts as aforesaid.

"However, should my said son, Charles A. Keating, survive me and he prove to be a careful and prudent man, then it is my desire, if my said trustee think best, that he, my said trustee, shall convey by a proper instrument, the title to all of said real estate, in fee simple to my said son, Charles A. Keating. But I hereby expressly declare that my said trustee shall not be required to convey said real es-

tate under any condition, or order of court, except as he may deem for the best interest of my said son, Charles A. Keating; meaning hereby to give unto my trustee, full power and authority over and control of said real estate, with only the following limitations:

"First: That during the lifetime of my said son, Charles A., should he survive me, I desire that he be provided for, so far as can be, from the proceeds to be derived from the use of said real estate, after payment of taxes and necessary expenses or until such time as my said trustee may deem it advisable and prudent to convey said real estate in fee as aforesaid to my said son Charles A., and this trust is expressly created for the use of my said son Charles A. during his lifetime; but that the fee to said real estate shall be in my said trustee, subject to be conveyed to my said son Charles A. whenever my said trustee deems it advisable as hereinbefore stated; but in case no such conveyance is made by my trustee, then and in that case my said trustee shall be declared the absolute owner thereof and shall have full right and authority to make such disposition thereof as he may deem for the best interest of my estate, and this instrument to be his full and sufficient authority therefor, without any order of any court; subject however, to the life interest as aforesaid of my said son Charles A. should he survive my said trustee."

William H. Keating was also made executor of the will, without bond. After the testator's death, William H. Keating assumed charge of the estate, settled its affairs, and received his discharge as executor. From that time until the beginning of this suit, he has continued to hold the title to the land devised to him in trust, as aforesaid, and during that period has exercised control over the land, leasing it, paying taxes and other expenses. From time to time, he has paid sums of money to Charles, as representing income or rents of the property.

In October, 1914, Charles began this suit in equity, alleging, in substance, that he is a careful and prudent person, within the meaning of the trust created by his father's will, and capable of taking proper care of the property devised for his benefit; that he has demanded of the defendant a conveyance of said property to himself and a termination, settlement, and accounting of and concerning the trust estate; and that defendant has arbitrarily and wrongfully refused said demand, and declared his purpose to permanently retain said title in himself, or convey it to his own daughter.

The defendant admits the will of his father, as stated, but denies that the purposes of the trust created thereby have been accomplished, and alleges that plaintiff is both physically and mentally incompetent to manage and properly care for the property. He further denies the jurisdiction of the court to control his discretion with respect to the trust, and insists that, under the terms of the will, he has full and uncontrolled right and authority to administer said trust as to him shall appear just and right.

Other alleged facts are pleaded in the petition and answer, to which, so far as material to the determination of the rights of the parties, reference will be made in the further progress of this opinion.

The evidence on plaintiff's part tends to show that, for a period of several years, beginning before his father's death, he suffered more or less from ill health, which he attributes to an injury to his back, and to the effects of a sunstroke. During the years 1893 and 1894, he attended school to some extent, and did some work as a canvasser in Iowa and Illinois, and followed this with six months' attendance at Chadwick College. In 1897, he went to Kirksville, Missouri, for osteopathic treatment, and while there, pursued the study of osteopathy. In the following year, he returned to Oskaloosa, where, he says, he asked the defend-

ant to convey the land to him. Defendant was then about to leave home, for service in the Spanish War, and, according to plaintiff's story, said to him that the matter was so fixed that, in case anything should happen to himself, plaintiff would have the farm without any trouble, and that plaintiff was entitled to the farm and should have it. The defendant testifies, in substance, as we understand him, that at this time he did leave the charge and oversight of the property in plaintiff's hands, and delivered to him quite an amount of notes and securities, with authority to collect. Soon after this, plaintiff settled in Marshalltown, where he practiced osteopathy for two years or more. During this period, he married, and since that time has, with his wife, maintained a home. The marriage was displeasing to the defendant. In 1900, plaintiff attended and graduated from the Still College of Osteopathy at Des Moines, where, excepting a brief return to Marshalltown, he has ever since practiced his profession. He claims to have earned a respectable living for himself and wife, is carrying $3,000 of life insurance, and has a savings fund of several hundred dollars in the bank. He says, and of this there appears to be no contradiction, that he is not in debt. In support of his claims, he puts in evidence the testimony of his landlord, who has been his next-door neighbor for several years, and knows him quite intimately, and of others who have known and employed him in a professional capacity, merchants and grocers with whom he has dealt for years, physicians who have treated him, and officers of insurance associations of which he is a member, all of whom know him personally and have opportunity to observe his character and qualities; and all unite in speaking of him as a man not addicted to extravagance or bad habits. He is a member in good standing in prominent fraternal orders, and appears without question to have general recognition as a man of good repute and fair average mental capacity.

As opposed to this, there is the testimony of no witness who claims to speak from personal knowledge or observation, except the defendant himself; but he offers the testimony of several physicians, who, in answer to hypothetical questions, based almost entirely upon the assumed correctness of statements made in testimony given by the defendant, were permitted to answer that, upon such assumption, the expert "would say the plaintiff is not a careful or prudent man," or was "not of sound mind and not a careful and prudent man."

Of the value of this expert evidence, we have only to say: First, that it is at least very doubtful whether a medical expert, however learned, is any better qualified than the court or juror to declare that any given man is a careful and prudent person; and second, that the hypothetical question in this case is loaded with so much matter of assumed fact which is not established by the evidence that the answers thereto are entitled to little consideration.

Coming, then, to the testimony of the defendant himself, who alone undertakes to testify to the plaintiff's physical and mental incompetence, his theory of his rights as trustee is not without value in construing and weighing his statements with respect to the disputed facts. This is illustrated in the following excerpts from the record. Among other things, he says:

"I have made no disposition of the real estate in question, and have not provided for it by will. I aim to carry out the purposes and intentions of my father, as provided for in his will, just exactly as therein stated. If my brother is entitled to the property, he will get it, if he is a competent and careful man. My interpretation of the will is that it gives me absolute, uncontrolled determination of that question."

Following this, in answer to inquiries, he proceeds to say:

"I intend to convey the property to my brother Charles, in case I consider him a careful and prudent man. I do not consider him such now. This is because of his physical and mental condition—not such as is indispensable to the handling of property. I mean he is not mentally right. By the Court: What is there in his physical condition that makes you think he is not a careful and prudent man? A. My belief is that his mental [physical?] condition makes his mind weak. I do not think there is any other explanation I can make. By the Court: The simple statement that his mental condition is such that you do not consider him a careful or prudent man is not very clear to the court; what do you mean? A. Well, a trouble that has lasted since he was a child to the present. By the Court: What trouble? A. Self-abuse, that commenced when he was about ten years of age, and also through the past years. By the Court: You don't mean the court to understand that applies to him now? A. Yes, I mean that it affects him now. As foundation for my statement I have his own statements written to me, and my taking him to a physician and having a physician examine him. I have no written statement from him, because at his request I destroyed it. He said to me he had practiced self-abuse, but he has not said anything on the subject since he was thirty years of age." [Plaintiff was forty-six years of age at the time of the trial below.]

Plaintiff denies making any such statement, and denies that he ever practiced the vice mentioned. He admits that, prior to 1897, he suffered from nocturnal losses, but says the weakness was the result of accidental injury to his back, and that, in the year named, he was cured by treatment administered to him at Kirksville, Missouri. In view of the denial by plaintiff, and of defendant's admission that the evidence upon which he relies for his sweeping statement relates to a time not less than sixteen years in the

past, we think the charge against plaintiff of vicious and degrading habits has no sufficient support in the record. But even if it be admitted that he is now a man of bad or immoral habits, that fact alone would afford no justification for refusing to convey the trust property to him, if he be in fact fitted for its care and preservation. The terms of the trust do not make the trustee the moral censor of his brother's conduct, or make his moral character a condition on which he will be entitled to receive the property. Except for certain letters written and statements made by plaintiff, which are relied upon by the defendant as affording support for his claim that his brother is not competent for the proper care and preservation of the property, the defense rests, as we have said, upon the uncorroborated testimony of the defendant himself. The letters referred to were, for a large part, written during the years 1903 and 1904, though there are some of both earlier and later dates. The chief thing they show is plaintiff's complaints of ill health, which he believed threatened serious results, and at times he complained that his business was not prosperous, and that he was compelled to use economy to get along. So far as we are able to discover, they exhibit no evidence of incompetence or inability to care for his property, had it been delivered into his keeping. The sole testimony tending to show any wastefulness on his part is that of the defendant, who says that, before going to the Spanish War, he placed plaintiff in charge of money and securities to the amount of about $2,500, and that, on his return home, this had all been spent. How spent, or whether improperly spent, no particulars are given. This claim is denied by plaintiff, who says he received no more than a fraction of the amount mentioned by defendant, and of such as he did receive, he returned the principal part to defendant's agent. Omitting this one item, which is vaguely and indefinitely stated, there is no showing whatever that

plaintiff is otherwise than reasonably careful and prudent in matters relating to business and property. Living at all times upon a slender income, and lacking physical strength and vigor to qualify him for a strenuous struggle in the general business world, he has kept out of debt, appears to be sober and industrious, and to command the confidence and respect of his neighbors. His income from his profession is modest in its proportions. The aid he has received from the defendant, the trustee of the estate left him by his father, has never been large, and we think it must be said he makes a fairly creditable showing of his ability to care for and wisely expend the money and property coming into his hands. Turning to defendant's itemized statement, covering the twelve years from 1903 to 1914 inclusive, and after deducting charges for taxes, repairs, and other expenses, there have been but two years in which the payments to plaintiff exceeded $300, and in six of the twelve years, they have been less than $200. That plaintiff has been able to live, support himself and wife, and keep out of debt, is quite satisfactory evidence that he is neither a spendthrift nor a sluggard.

Indeed, while defendant asserts the alleged incompetence of the plaintiff, we think it clear that he relies for his defense less upon this ground than upon the construction he places upon his father's will. It is his contention that the will clothes him with absolute and uncontrolled discretion in the matter of turning over the estate to plaintiff, and that neither the plaintiff nor the court has the power or right to compel a termination or surrender of the trust, or to inquire into his reasons for refusing so to do. Such is the plea made in his answer, and such is his attitude as a witness. He says:

"If my brother is entitled to the property, he will get it. My interpretation of the will is that it gives me absolute and uncontrolled determination of that question."

It is not too much to say that he interprets the will as

vesting in him both the legal and equitable title to the land, subject only to a sort of precatory charge in plaintiff's favor, leaving himself at perfect liberty to exercise his own choice whether to make or refuse conveyance of the property, or, if he shall so elect, to convey the same to any member of his own family, or give it to some charitable institution. This is indicated in a letter written by the defendant to his sister, ten years before the suit was begun, in which, speaking of the plaintiff and his relation to the property left by his father, he says:

"You evidently do not know the fact that, long before father or mother died, I promised Charlie that, if no will was left or anything done, that my share of the estate should go to him for his care of father and mother, as he actually lost his health. I fail to see how you could even ask anything of him or from him, knowing his health and his condition. During all this time that I have had control of this affair, I have never used one penny from the estate. I keep the fund entirely separate from my own, so that when I go out of life, it will be a separate and distinct fund. I have even gone so far as to make provision in my will for the care of you and Charlie as long as the farm will care for you. The time when you will need this care will be when you cannot help yourself, and that time is coming. It will come to all of us sooner or later, and since you have not made provision for the future, and cannot do so now, you have perhaps that consolation of knowing that, when Charlie is done with the income from the farm, the entire income will be yours. The farm will then go to Earl Keating, in order to keep it in the Keating name, should he turn out to be a good boy. If he doesn't, and should become like his father, reckless and dissipated, it would only make him that much worse to give him anything, and then I shall do something else with the farm. If my own girl be a good girl, it is possible that I would give it to her, if I lived

to know that she was, in case Earl should turn out to be bad. But if she is not a careful and prudent woman, giving her property of this character would simply add to her downfall, and I would give it then to some institution for the benefit of the unfortunate."

This language is fairly expressive of his conception of the trust reposed in him and the attitude he has at all times taken with respect thereto. This brings us, then, to the vital question in the case,—a question of law. What is the legal force and effect of the devise? If it be true that it vests in the defendant what he terms an absolute, uncontrolled discretion, such answer ends this case, and the judgment below must be affirmed, without regard to what may be the truth of the facts on which the witnesses disagree.

2. TRUSTS: construction and operation: uncontrolled discretion. The language and form of the devise are remarkable, not only for the broad scope of the discretion reposed in the trustee, but also for the fact that it contains provisions which, if given literal force and effect, offer strong temptation to the trustee to exercise that discretion in his own interest, and against the interest of the beneficiary of the trust. In here calling attention to the fact that this will was prepared and drawn by the trustee himself, and is framed in careful legal phraseology, calculated to enlarge and magnify to the widest extent the power and discretion lodged in him, we do not suggest or find that he was actuated by actually fraudulent purpose; but we think it presents a situation so anomalous, and creates a relation so capable of being abused, that the court should not overlook these circumstances in construing the devise, to the end that the testator's benevolent purpose shall not be defeated, nor his bounty diverted into channels not within his contemplation, and that all doubts arising as to the testamentary construction should be solved in favor of the beneficiary, and against the trustee. It is to be admitted that a

property owner may convey or devise land in trust, and may vest the trustee with very wide discretion therein. It is also admitted that, so long as the trustee keeps within the limits of fairness in his dealings with the subject of his trust and with the beneficiary, the courts may not arbitrarily interfere, or control the manner in which he shall discharge his duty. We think it equally true that no trust has been or can be created in property where the discretion of the trustee is so broad or illimitable that equity will not entertain a complaint by the beneficiary that the trust has been or is being abused, or that the property is being wrongfully diverted, to the destruction or defeat of the purpose for which the founder established it. This is quite definitely put to rest in this state, both by statute (Code Section 3293), and by the recent decision of this court in *In re Clark,* 174 Iowa 449, where Mr. Justice Salinger, writing the opinion, very pertinently and forcibly says that "to give the maker of a will the prerogative of completely ousting the courts of jurisdiction in the premises is to allow him to nullify the statute which gives the court control of the trustees appointed by will, even to the extent of removal." Even in the absence of statute, the authority to entertain complaints alleging improper or arbitrary and unreasonable conduct of trustees in the administration of trusts has long been held to be inherent in courts of equity. Of the many authorities to that effect, see the following: *Keeler v. Lauer,* 73 Kan. 388 (85 Pac. 541) ; *Colton v. Colton,* 127 U. S. 300 (32 L. Ed. 138) ; *Angell v. Angell,* 28 R. I. 592 (68 Atl. 583) ; *Gardner v. O'Loughlin,* 76 N. H. 481 (84 Atl. 935) ; *In re Van Decar,* 49 Misc. Rep. 39 (98 N. Y. Supp. 309) ; *Collister v. Fassitt,* 163 N. Y. 281 (57 N. E. 490) ; *Woodward v. Dain,* 109 Me. 581 (85 Atl. 660) ; *Clark v. Clark,* 23 Misc. Rep. 272 (50 N. Y. Supp. 1041) ; *Kintner v. Jones,* 122 Ind. 148 (23 N. E. 701) ; *Bacon v. Bacon,* 55 Vt. 243; *McDonald v. McDonald,* 92 Ala. 537 (9 So. 195) ; *Butler v. Badger,* 128

Minn. 99 (150 N. W. 233); *In re Norton,* 97 Misc. Rep. 289
(161 N. Y. Supp. 710); *Albright v. Albright,* 91 N. C. 220.
In the language of the New York court, in *In re Van Decar,*
supra:

"When it appears that any trustee, no matter how
broad the discretion which is bestowed on him, is so ad-
ministering his trust that it fails to accomplish the purpose
for which it was created, then it seems to me that the time
has come for the court to intervene."

The same court, in *Clark v. Clark,* supra, says:

"There can be no doubt that, however large the discre-
tion of trustees may be, the court never loses its power to
review the use of this discretion, and if need be to correct
any abuse of its exercise."

See also *In re Stevens' Estate,* 20 Misc. Rep. 157 (45
N. Y. Supp. 908). In *Bacon v. Bacon,* 55 Vt. 243, property
was devised to a trustee for the benefit of a son, but pro-
viding substantially, as in the present case, that the trustee
should hold the estate until, in his judgment, the son should
"prove worthy of the same, and then and not until then
deliver it." The will also, as in this case, directed that, if
the trustee should not at any time judge it best to deliver
the property, "it shall remain his property forever." Speak-
ing of the authority of the court in such cases, it is there
said:

"A trustee cannot exercise his discretion and judgment
from fraudulent, selfish, or other improper motives; nor
can he refuse to exercise them from such motives. And if
he acts or refuses to act upon such grounds, the court will
interfere, and give a remedy to the party injured by the
fraudulent act or refusal to act. A person having a power
must exercise it *bona fide* for the end designed." See, also,
2 Perry on Trusts, Section 508.

Nor can any provision in the trust instrument, how-
ever emphatically expressed, intended to relieve the trus-

tee from any responsibility to the courts, prevent the inter-
ference of equity to see that the trustee's power and discre-
tion are not exercised arbitrarily or selfishly, or with dis-
regard for the purposes for which the trust is created.
This is fairly held in *Butler v. Badger,* 128 Minn. 99 (150
N. W. 233). In that case the trust considered was upheld,
but, speaking of a provision therein, relieving the trustee
from interference by the courts, the opinion says:

"If this had been an attempt wholly to exclude the au-
thority of the court to control the conduct of the trustee,
and to vest in him arbitrary authority to sell and dispose
of the estate in harmony with his own pleasure and with-
out regard to the best interests of the estate, no doubt
the trust would, at least, to the extent of such grant of
arbitrary power, be declared void. Trusts of this kind are
subject to the supervisory control of the courts, even in
cases where attempt is made by express stipulation between
the parties to avoid judicial interference."

And we think, if the devise in this case were to be con-
strued in accordance with the defendant's theory, as being
intended to give him absolute and uncontrolled discretion,
independent of any authority in the court to control its ar-
bitrary exercise, it would have to be held, to that extent,
void.

3. WILLS: con-
struction: na-
ture of estate
created: sepa-
ration of legal
and equitable
estate.

If this devise creates a trust (and that
it does, defendant cannot be heard to deny),
the ownership of the property which is the
subject of the trust necessarily takes on a
double aspect. The legal and the equitable
title are separated, the former vesting in the trustee, and
the latter in the *cestui que trust.* The trustee holds the
legal title, not for his own benefit, but for the use of the ben-
eficiary. In the declaration of trust, the testator expressly
provides that he devises the described real estate to Wil-
liam H. Keating "in trust for the benefit of my son Charles

A. Keating should he survive, me." This clearly states the general purpose and intent of the testator, and the will should be given such effect. The beneficiary did survive the testator, and the equitable estate of the latter at once vested in him. Nothing which the trustee could thereafter lawfully do could deprive plaintiff of that estate, save by the fair and reasonable exercise of the discretion given him to sell and convey the property, and even in that case, the

4. WILLS: construction: precatory words used in mandatory sense.

trust character would follow and attach to the proceeds of such sale in the trustee's hands. That it was the desire and intent of the testator that the trust should be terminated, and the legal title be united with the equitable in Charles as soon as the latter should become a capable and prudent man, is very clear; but should he fail to develop such character or quality, then the trust should terminate with his life. Charles was at that time still young, with little practical experience, and his father evidently proposed to withhold the legal title from him temporarily, as a spur or inducement to proper preparation on the son's part for the duties of life, and if he should fail in this respect, that the use of the property should be devoted to his care and support. That he should impose this trust upon his eldest son, a man of mature years and judgment, a lawyer, and the chosen executor of his will, and rely not only on his discretion, to act wisely, but also upon his affection for and interest in his brother, to act fairly and to turn over the property whenever the latter should become entitled thereto, according to the true spirit and intent of the devise, was not strange. That he for a moment believed that he was giving, or that he intended to give, the trustee absolute and arbitrary power to do as he pleased with the legal title, we cannot for a moment admit. He gave the trustee a broad discretion; but the law implies, and such, we think, is the fair indication of the language

of the devise, when read as a whole, in the light of all the circumstances, that the title should not be withheld by such trustee unreasonably or capriciously. If, as a matter of proved fact, the plaintiff has become and is a person of reasonable care and prudence, in whom the title can be vested without any apparent danger of the property's being wasted, then the refusal of the trustee to convey the title, and his announced determination to retain such title in himself, and ultimately either to give it to one of his own family or to dispose of it otherwise than for the use of the plaintiff, make a sufficient case to justify the court's interference for the protection of plaintiff's rights. It was the clear purpose of the testator to give the entire property, and not its mere use, to the plaintiff, and the interposition of the trust was intended as a mere expedient to prevent the waste of such property by its premature vesting in him before he had reached the age or acquired the experience requisite to its reasonable care and management. It is now twenty-three years since the death of the testator. The plaintiff is now a man of middle age. The evidence quite satisfactorily shows him to be a man of reputable character, of correct habits, a good citizen, and not a spendthrift. There is nothing showing reasonable ground to fear that, if vested with full title to the property, he will squander it or be reduced to want. Under such circumstances, we are disposed to hold that the refusal of the trustee to make the conveyance is unreasonable and arbitrary.

There is another aspect of the case to 5. TRUSTS: tenure of trustee: removal: grounds. which we may properly call attention. It is one of the elementary rules of the law of trusts that, when a trustee repudiates his trust, or sets up or asserts rights to the trust property which are destructive of the trust, or otherwise antagonistic to the rights and interests of the beneficiary, the latter may maintain an action in equity for the removal of such trus-

tee, and for an accounting. A rule has also been applied that, where the duties of the trustee are such as to bring the parties into personal touch or inter-

6. TRUSTS: tenure of trustee: removal: grounds.

course with each other, and the relations between them have become so hostile and acrimonious that the trustee's continuance in office would be detrimental to the trust and destructive of the mutual confidence which ought to exist with respect to the business, the court is at liberty to remove the trustee, even though he be not charged with any dishonesty, and, if necessary, appoint another, against whom no such objection exists. *May v. May,* 167 U. S. 310, 321, 322; 39 Cyc. 263. We think there can be no doubt that the defendant, from an early date in the history of affairs leading up to this suit, has assumed an attitude and asserted an authority amounting to a practical denial of the trust as we have interpreted it. That plaintiff was and always would be an unfit person to be entrusted with the legal title to the property seems to have been settled in defendant's own mind from the start, and that whatever benefit plaintiff should receive from the property should, at most, be limited to the income during life, leaving the legal title in himself, to do with as he saw fit. It may be conceded that he has been and is perfectly sincere in his opinion or belief in this respect, but it is very evident that such convictions and such attitude disqualify him for the duties of trustee of his brother's rights and interests almost, if not quite, as completely as if he were led by actually sinister motives—a situation which, if the trust were to be continued, would call for a change of trustees. These conclusions render it unnecessary to make further reference to the hostility which now marks the relations between these brothers, except to say that the friction and dissatisfaction which have been culminating through a series of years cannot have been otherwise than greatly

. aggravated by circumstances and incidents of the trial below, concerning which specific mention need not now be made.

The authorities to which our attention has been called by appellee have, at most, only remote bearing on this controversy. Of the precedents cited, nearly all have reference to a class of trusts to which this trust does not belong. They treat of provisions by which a trustee is au- . thorized or directed at his discretion to pay money or deliver certain benefits to the beneficiary, from time to time, but which are to cease upon the insolvency or bankruptcy of the latter. Such a trust constitutes a devise by which a parent or other friend may contribute to the necessities or support of a child or other person, without danger that the fund established for that purpose will be diverted from ' its intended end, and subjected to the claims of creditors of the beneficiary. Such a trust vests no estate in the beneficiary; or, more correctly speaking, the estate is a terminable one, and ceases upon the occurrence of insolvency in the beneficiary, or of other specified act or event which, but for such restriction, might expose the estate to seizure for his debt. These are what are known as "spendthrift trusts." Such is not the effect of the devise for the benefit of the present plaintiff.

Having found that the court has jurisdiction in the matter, we have no difficulty in arriving at the conclusion that the decree below should be reversed, and the cause remanded to the trial court, with directions to enter a decree terminating the trust, and for a final accounting by the defendant with respect thereto.

7. TRUSTS: management: allowance of attorney fees out of trust fund.

It should also be said that the trial court entered an order requiring defendant, as trustee, to pay a stated sum in the nature of attorney's fees for plaintiff's counsel, and that defendant has appealed there-

from. Without any suggestion as to how we should have viewed this question had we affirmed the principal decree, we think it must be said that, since we have found the merits of the controversy to be with plaintiff, the order complained of should be permitted to stand.—*Reversed on plaintiff's appeal; affirmed on defendant's appeal.*

GAYNOR, C. J., LADD and STEVENS, JJ., concur.