JOHN MOORE WALLACE, JR., *et al.*, v. JOSEPH JULIER, *et al.*

3 So. (2nd) 711
En Banc
Opinion Filed June 10, 1941
Rehearing Denied September 12, 1941

*Charles Cook Howell* and *Charles Cook Howell, Jr.,* for Appellant;

*L'Engle, Shands, McCarthy & Lane, E. J. L'Engle, J. W. Shands, E. W. Lane, Jr., McLanahan, Merritt, Ingraham & Christy,* Attorneys for Joseph Julier and Atlantic National Bank of Jacksonville, as Executors and Trustees;

*Milam, McIlvaine & Milam, Robert R. Milam,* At-

torneys for William L. Burton, II, and Mabel Burton Iles and B. M. Iles, her husband.

BUFORD, J.—Mrs. Katherine Ella Burton, the widow of Captain William L. Burton, died in 1928. At the time of her death she was possessed of a large estate, the most of which was inherited from her husband who had predeceased her by about one year. She devised all her property by will. That part of the will with which we are concerned here is contained in Item 10, which reads as follows:

"TENTH: All the rest, residue and remainder of my property and estate of every kind or nature and wheresoever situated, I give, devise, and bequeath as follows:

"1. Forty (40%) per cent of my said residuary estate I give, devise and bequeath to my Trustees hereinafter named, *in trust nevertheless,* to invest and to keep the same invested and to pay such portion of the net income therefrom as they may in their discretion deem necessary or proper—but not less than twenty thousand ($20,000) Dollars a year or more than thirty thousand ($30,000) Dollars a year—to my granddaughter, MABEL BURTON WALLACE, until she shall reach the age of thirty years, the same to be so paid by my said trustees in monthly or quarter-yearly installments as nearly equal as may be practicable and convenient; and when my said granddaughter shall have reached such age of thirty years, to pay transfer and set over to her any balance of income which may have accrued from said fund over and above the amount so paid by my said Trustees as aforesaid to my granddaughter prior to her reaching such age. Thereafter, that is, after my said granddaughter shall have reached the age of thirty years, I direct my said

Trustees to pay the entire net income from said fund to my said granddaughter for and during the remainder of her life in such monthly or quarter-yearly installments as aforesaid and after her decease to continue to hold said fund until her son (my great-grandson) JOHN WALLACE, shall reach the age of forty years, or until his death if he shall die prior to that time, for the uses and purposes following viz.: to distribute the income therefrom in such monthly or quarter-yearly installments as aforesaid among the issue or lineal descendants of my said granddaughter living at the date of each distribution, in equal shares per stirpes and not per capita. When my said great-grandson shall reach the age of forty years or upon his death if he shall die before reaching such age, I direct my Trustees to distribute the principal of the fund (and any accumulations of income then remaining undistributed) among the issue or lineal descendants of my said granddaughter MABEL BURTON WALLACE, then living, in equal shares per stirpes and not per capita.

"In case my said granddaughter shall leave no issue or lineal descendants her surviving, but my grandson WILLIAM L. BURTON, II, shall be then living, I direct by Trustees to continue to hold said fund, to invest and to keep the same invested and to collect and receive the income therefrom and to accumulate the net income from the fund until my said grandson shall reach the age of thirty years and thereupon to pay, transfer and set over such accumulated income to my said grandson as his own property absolutely; and thereafter, that is, after my said grandson shall have reached the age of thirty years to pay the entire net income from such fund to my said grandson for and

during the remainder of his life in monthly or quarter-yearly installments as nearly equal as may be practicable and convenient.

"Upon the death of my said grandson—or upon the death of my said granddaughter, if she shall die without leaving any issue or lineal descendants her surviving and my said grandson shall fail to survive her—I direct that the principal of the fund be distributed among the issue or lineal descendants of my said grandson then surviving, in equal shares per stirpes and not per capita, or if there shall be no such issue or lineal descendants of my said grandson living at that time, to distribute the same among my next of kin entitled by the laws of Florida then in force to inherit and receive my property in case of intestacy, the same to be distributed to the same persons and in the same manner and proportions as if I had died intestacy, at that time owning such property.

"II.   Sixty (60%) per cent of my said residuary estate I give, devise and bequeath to my Trustees hereinafter named *in trust nevertheless,* to invest and to keep the same invested and to pay or apply so much of the net income therefrom as they may in their discretion deem necessary or proper for the education, maintenance and support of my grandson WILLIAM L. BURTON, II, during his minority—the amount so expended, however, not to be less than Six Thousand ($6,000) Dollars or more than ten thousand ($10,000) Dollars in any year during such period and my Trustees to have full power and authority either to pay such allowance wholly or in part to any general Guardian duly qualified and appointed and under sufficient bonds approved by a court of competent jurisdiction (for expenditure by such general guardian on behalf

of said minor) or in their absolute discretion personally to apply and expend said allowance or so much thereof as they may see fit to so expend and apply, for the purpose hereinabove mentioned, to-wit, for the education, maintenance and support of said minor, without the intervention of any such guardian of said minor.

"I further direct my said Trustees to pay to my said grandson, after he shall have reached his majority, and until he shall have reached the age of thirty years, such portion of the net income from said fund as they may in their discretion deem necessary or proper—but not less than Ten Thousand ($10,000) Dollars a year or more than $20,000 a year during the period between the date when he shall reach the age of twenty-one and the date when he shall reach the age of twenty-five years, and not less than Fifteen Thousand ($15,000) Dollars a year or more than Thirty Thousand ($30,000) Dollars a year between the date when he shall reach the age of twenty-five years and the date when he shall reach the age of thirty years. Such income shall be so paid in monthly or quarter-yearly installments as nearly equal as may be practicable and convenient.

"When my said grandson shall reach the age of thirty years, I further direct my said Trustees to pay, transfer and set over to my said grandson any balance of income which may have accrued from said fund prior to his reaching said age, over and above the amount so paid to him or to his general guardian or expended on his behalf as hereinbefore provided. Thereafter, that is to say, after my said grandson shall have reached the age of thirty years, I direct my said Trustees to pay the entire net income from said fund

to my said grandson for and during the remainder of his life, in such monthly or quarter-yearly installments as aforesaid. It is my will, however, and I hereby direct that my Trustees shall have full power and authority to pay, transfer and set over to my said grandson at any time, or from time to time, after he shall have reached the age of twenty-five years, such portion or portions of the principal of the above described fund held by them for his benefit as they may in their absolute discretion deem it proper or for the best interests of my said grandson so to advance to him.

"Upon the death of my said grandson, I direct my said Trustees to pay, transfer, set over and distribute the principal of said fund or so much thereof as shall not have been advanced to him as above provided, and any accumulated income not previously paid over to my said grandson pursuant to the terms hereof, to and among the issue or lineal descendants of my said grandson then living, in equal shares, per stirpes and not per capita.

"In case my said grandson shall die leaving no issue or lineal descendants him surviving, but my granddaughter shall be then living, I direct my Trustees to continue to hold said fund, to invest and to keep the same invested and to collect and receive the income therefrom and to accumulate the net income from the fund until my said granddaughter shall reach the age of thirty years and thereupon to pay, transfer and set over such accumulated income to my said granddaughter as her own property absolutely; and thereafter, that is to say, after my said granddaughter shall have reached the age of thirty years, to pay the entire net income from said fund to my said grand-

daughter for and during the remainder of her life in monthly or quarter-yearly installments as nearly equal as may be practicable and convenient.

"Upon the death of my said granddaughter—or upon the death of my said grandson if he shall die without leaving any issue or lineal descendants him surviving, and my granddaughter shall fail to survive him—I direct that the principal of the fund be distributed among the issue or lineal descendants of my said granddaughter then surviving in equal shares per stirpes and not per capita, or if there shall be no such issue or lineal descendants of my said granddaughter living at that time, I direct that the same be distributed among my next of kin entitled by the laws of Florida then in force to inherit and receive my property in case of intestancy, the same to be distributed to the same persons and in the same manner and proportions as if I had died intestate at that time owning such property."

And Item 12, which reads as follows:

"TWELFTH: I authorize and empower my executors, hereinafter named, to retain any investment made or held by me so long as they may, in their discretion, deem wise; to allot to any legacy, share or trust fund any securities or other property held by me at the time of decease at such valuations as they may consider equitable, and to compromise and settle any claims which may exist in favor of or against my estate. The determination of my executors in regard to the value of property of my estate distributed in kind or allotted to any trust fund or to my share or part of my estate or of any fund shall be final and binding upon the persons interested in my estate or any of the funds created hereunder.

"I authorize and empower my Trustees, hereinafter

named, to retain any investments allotted as above provided to any trust fund created under this my last Will and Testament, so long as they may, in their absolute discretion, deem advisable and for the best interests of the fund; to make distribution of any fund whenever it shall become necessary to distribute the same, pursuant to the terms hereof, wholly or partly in kind, at such valuations as they may deem equitable, to change investments in their discretion and to mingle the several trust funds created hereunder so far as may to them seem advisable, for purposes of investment.

"Any determination of my Trustees as to the values of property distributed to them in kind, as above provided, shall be final and binding upon all persons in any way interested in such distribution or in the trust funds involved.

"I authorize and empower my executors and Trustees, in their discretion, to enter into, execute, deliver and carry out any agreements or agreement relating to the reorganization or management of any corporation or corporations in which I may be interested at the time of my decease, or the issuance and distribution of its stock, bonds or other securities, and to do any and all acts and things in connection therewith or in relation thereto which they may consider for the best interests of my estate or any fund created hereunder.

"My executors or Trustees, in making the distributions or payments on account of the income from my estate, or from any fund created under this my Last Will and Testament, shall have full power and authority to regard and treat any profits, accretions or increases as income and to determine, in their absolute discretion, what receipts shall be regarded as income

and what receipts shall be regarded as principal for all purposes connected with the administration of my estate or of any fund created hereunder."

And Item 14, which reads as follows:

"Fourteenth: In case the Trustees hereunder shall purchase any securities at a premium as an investment of any fund held by them or of any part thereof, they shall not be required to set aside any portion of the income therefrom as a sinking fund or otherwise provide for the possible depreciation in the value of said securities by reason of their approaching maturity or otherwise, or to restore or return to principal account any loss or diminution resulting thereto by reason of any such depreciation."

When Mrs. Burton died the executors of the estate of William L. Burton had not completed the winding up of his estate.

In 1933 Joseph Julier and Atlantic National Bank of Jacksonville as executors and trustees under the last will and testament of Katherine Ella Burton, deceased, filed their bill of complaint in the Circuit Court of Duval County, making certain suggestions alleging certain facts to exist and praying that "Your orators may be duly instructed as Trustees as to the manner of the administration of the trust provided in the Tenth paragraph of said Will and in particular that Your Orators as Trustees may be fully instructed as to what part or portion of said estate when realized upon and liquidated can be considered as income for the purpose of distribution by way of dividends to the beneficiaries of the trust set up in paragraph Ten of said Will and what part or portion of said estate must be considered as principal of said trust fund and held and reinvested for eventual distribution to the residuary beneficiaries of said trust."

The bill prayed the court to retain jurisdiction so that the Trustees might have their future acts, doings and accounts as such Trustees ratified and approved.

The bill proposed a plan for issuing debentures by a corporation to be known as Burton Estates, Inc., and to which corporation would be transferred all and singular the assets of the estate of Katherine Ella Burton at a value fixed and determined to be $1,671,800.00 and which had been determined by valuing the stock of Burton-Swartz Cypress Company of Florida at par and valuing the remaining assets of said estate at $500,000.00, the corporation to acquire the assets of said estate in payment for 600 shares of stock of said corporation and thereby the Executors and Trustees to become owners of all of said shares of stock. Later, by amendment to the bill, it was proposed to amend the charter of Burton Estates, Inc., so as to make all the shares common stock of the par value of $100.00 per share and the bill was also amended so as to set up in detail proposals for the issuance of debentures by Burton Estates, Inc., for the purpose of procuring funds with which to satisfy certain bequests made in the Will. The prayer of the amendment is:

"That as an alternative for the allotment and distribution of the capital stock of Burton Estates, Inc., as set forth in the bill of complaint herein, an order may be entered herein construing said will in the manner herein and in said bill of complaint set forth as to the right of your orators as executors and trustees to have caused to be organized said corporation and to transfer to said corporation all of the assets of said estate in the hands of your orators as executors and the execution and delivery of said Debenture

Indenture and Debentures thereby to be secured and the allotment and distribution of said Debentures and of the Stock of said corporation in the manner and in the amounts hereinabove set forth or described or in such other manner and in such other amounts as the Court shall direct, in full payment of the several unpaid gifts, legacies and bequests and the creation of the several trusts in said will provided and for the payment of financing of the other obligations of said estate accrued or hereafter to accrue as hereinabove mentioned and referred to, and that in general the proposed acts of your orators as Executors in connection with the assets of said estate and the said corporation and the stock thereof and the said Debenture Indenture and the Debentures thereby to be secured may be directed and thereafter ratified, approved and confirmed."

On final hearing final decree was entered which *inter alia* provided: a method for raising funds with which to satisfy specific bequests in the Will and directed and approved the creation of an estate corporation as a vehicle to handle the testatrix's estate and authorized the conversion of property of the estate into that corporation.

Such corporation thereupon became the *alter ego* of the trustees and as such the propriety of its acts must be determined in the light of the Will and must be controlled by the provisions of the Will of the decedent. See *Re* McLaughlin's Estate, 164 Misc. 539, 299 N. Y. Supp. 359; *In Re* Adler's Estate, 299 N. Y. Sup. 542, National Newark & Essex Banking Co. v. Work, 109 N. J. eq. 468, 158 Atl. 109; *In Re* Clark's Will, 204 Minn. 574, 284 N. W. 876; *In Re* De Con-

stantinovitch's Estate, 137 Misc. 328, 343, 283 N. Y. Supp. 270. In the latter case the Court said:

"Some argument is made that by reason of the organization of the realty corporation pursuant to Supreme Court order this Court must examine and will be bound by any special provisions in the charter of the corporation relating to the disposal of the proceeds of sale. With this position the court wholly disagrees. The corporation is a mere vehicle for administration. The rule for decision is to be found in the underlying instrument—the will of deceased. The question is to be determined on the same basis which would exist if the parcels had remained at all times in the ownership of the trustee and had been sold in its name and the proceeds, inclusive of the profits, paid directly to it in its character as trustees."

While that decree adjudicated that the *net* income accruing from certain named sources should be held in trust for the life tenants, it did not adjudicate what receipts should constitute income, nor what receipts should constitute principal or corpus. No attempt was made by the Trustee to segregate income from capital estate, nor to make a proration thereof as between life tenants and remaindermen until the time of instituting the instant suit.

It is too well settled in this and other jurisdictions that the lodestar to be followed by the courts in construing a will is the intent of the testator as gathered from what was written in the will.

The question presented to the court below, and the one which is before us now, is whether certain funds in the hands of the Trustees which have accumulated over a period of ten years and five months shall be treated as income inuring to the life tenants or as

corpus to be held for and delivered to the remainder-men. The record shows that practically all of these funds came into the hands of the trustees as dividends payable to the estate of Mrs. Burton on the interest of the estate in Burton-Swartz Cypress Company of Florida, and particularly from the operation of the sawmill plant at Perry, Florida, which will hereafter be referred to as the Perry plant.

In the final decree from which appeal is taken, the pertinent adjudications are as follows:

"1. That the report and accounts of said Trustees of their receipts and disbursements correctly show all moneys received and all disbursements made by said Trustees from and out of the assets of said trusts, and all of the receipts and disbursements of said Trustees as shown by saiid report and accounts of said Trustees and all the acts and doings and transactions of such Trustees for the period beginning June 20, 1935, and ended December 31, 1938, including their classification of all of the receipts of the Executors of the Will of Katharine Ella Burton, deceased, prior to June 20, 1935, and of said Trustees since said date to and including December 31, 1938, set forth in said bill of complaint and exhibits thereto, are hereby approved, except as hereinafter disapproved. The determination by the Trustees of income accruing to the life tenants for the period August 1, 1928, to December 31, 1938, in the sum of $686,490.82, as set forth on page 21, paragraph 8 of said bill of complaint, is hereby approved as an appropriate exercise of the Trustee's discretionary power under the will to apportion their receipts between principal and income. The defendant William L. Burton, II, is entitled to 60% of said income and the defendant Mabel Burton

Iles to 40%. The Court finds that the Trustees had paid prior to December 31, 1938, upon such income adjudged the sum of $174,504.20, of which $84,226.00 was paid to the said William L. Burton, II, and $90,278.20 was paid to the said Mabel Burton Iles. The charging by the Trustees to income of expenses aggregating $275,695.32 delineated at page 22 of paragraph 8 of the said bill of complaint and contained in Exhibits 'C' and 'D' of Haskins & Sells Report and Exhibit 'B' of Haskins & Sells Supplemental Report, is hereby disapproved and such expenses are hereby charged to corpus, that is to say, 60% thereof to corpus of said Burton Trust and 40% thereof to said Galloway Trust.

"2. There is now due by said Trustees to William L. Burton II, as his balance of income for said period through 1938, the sum of $327,888.49. There is now due by said Trustees to Mabel Burton Iles as her balance of income for said period through the year 1938, the sum of $184,318.13. The plaintiff Trustees are directed to pay the said sums to the respective beneficiary defendants herein as soon as they can reasonably do so, subject, however, to the terms of the debenture indenture of Burton Estate, Inc., dated June 20, 1935, executed pursuant to the decree herein of June 20, 1935. As nearly as may be, the Trustees are directed to pay 50% of said sums respectively during the calendar year 1940, less any payments made by them to the respective beneficiaries since December 31, 1938; and the remaining 50% of the said balance due in approximately equal annual installments during the calendar years 1941 and 1942.

"3. That the portion of the receipts of said Trustees from the stock held by them directly or indirectly

in Burton-Swartz Cypress Company, a Florida corporation, classified in their accounts herein as income, is allowed as equitable income. That there is not involved in this proceeding any moneys or funds which may be received by the plaintiff Trustees after December 31, 1938 (except from funds of Burton Estate, Inc., received by it prior to December 31, 1938, or from Burton Securities Corporation out of dividends paid to it by Burton Swartz Cypress Company prior to December 31, 1938), or the classification as between principal and income of any such receipts, including receipts of or from any of the corporations whose stock is owned entirely or partly directly or indirectly by said Trustees, or paid over to said Trustees or Burton Estate, Inc., subsequent to December 31, 1938; nor are any of the rights of the parties hereto to principal or income for the period subsequent to December 31, 1938, considered, involved or determined; and this decree shall be without prejudice to the discretionary power conferred by the Will of Katharine Ella Burton, deceased, upon the said Trustees to apportion their receipts after December 31, 1938, as between principal and income."

The pertinent provision of Item Twelve is the paragraph reading as follows:

"My Executors or Trustees, in making the distributions or payments on account of the income from my estate, or from any fund created under this my Last Will and Testament, shall have full power and authority to regard and treat any profits, accretions or increases as income and to determine, in their absolute discretion, what receipts shall be regarded as income and what receipts shall be regarded as principal for

all purposes connected with the administration of my estate or of any fund created hereunder."

In this paragraph the Testatrix evidenced the intention to vest in the Trustees named the power and authority to treat profits, accretions or increases theretofore or thereafter accruing to her estate as income and thereupon to determine in their discretion what receipts shall be regarded as income and what receipts shall be regarded as principal for all purposes connected with the administration of the estate or the funds therein.

The entire context of the Will evidences the intention of the testatrix to make ample provision for the two life tenants named in the residuary clause of her Will and it is apparent that to carry into effect this intent she vested extraordinary powers in her Trustees. It, therefore, follows that the Will shall not be so construed as to allow the power vested in the Trustees to defeat the paramount intent of the testatrix.

The applicable rule in such cases is clearly stated in the case of McDonald v. McDonald, 92 Ala. 537, 9 Sou. 195, thus:

"The discretion which, by the terms of the Will in this case was vested in W. J. McDonald would not be interfered with or controlled by the Court so long as it is honestly and reasonably exercised by him. But the will does not confer an arbitrary or capricious authority. If it appears from the conduct of the Trustee that he is disposing of the rents, income and profits, not in carrying out the purposes of the trust, but in selfiish disregard of the claims of other beneficiaries, so that the design of the testatrix is defeated, then it is the duty of the court to interfere. Costabadie v. Costabadie, 6 Hare 410; Milsington v. Mulgrave, 3

Madd. 491; Tempest v. Lord Camoys, 21 Ch. Div. 571; Pulpress v. African Church, 48 Pa. St. 204; Proctor v. Scharpff, 80 Ala. 227, 1 Lewin, Trusts, (Flint's Ed.) p. 615; Flint, Trusts, Sec. 214, 2 Perry, Trusts, (3d Ed.) Sec. 511a. And if the discretion vested in the Trustee is mischievously or ruinously exercised, or, so far as concerns the comfort and support of the children, is practically not exercised at all, the court may provide for the administration of the trust under its own orders, ascertain the extent of the children's share of the rents, income and profits and secure the proper appropriation thereof. Davey v. Ward, 7 Ch. Div. 754; Thorp v. Owen, 2 Hare 607; *In Re* Roper's Trusts, 11 Ch. Div. 272; Raikes v. Ward, 1 Hare, 445; Conolly v. Farrell, 8 Beav. 347; Walker v. Shore, 19 Ves. 387; Brown v. Higgs, 8 Ves. 561. The foregoing rules are necessary to the due maintenance of the principle that a trust of this character may not be defeated by the negligence or willful default of the trustee."

See also Keating v. Keating, 182 Iowa 1056, 165 N. W. 74; Carrier v. Carrier, 226 N. Y. 114, 123 N. E. 135; Cromwell v. Converse, 108 Conn. 412, 143 Atl. 416; Greenwich Trust Co. v. Converse, 100 Conn. 15, 122 Atl. 916; Keeler v. Lauer, 73 Kan. 388, 85 Pac. 541; Mulcahy v. Johnson, 80 Colo. 499, 252 Pac. 816. In the latter case the court, after approving the rule above stated, said:

"In all doubtful cases the interests of the tenants are to be preferred to the interests of the remaindermen." See also Angell v. Angell. 28 R. I. 592, 68 Atl. 583; and Viall v. Rhode Island Hospital Trust Co., 45 R. I. 432, 123 Atl. 570.

Many other authorities which we have read in this connection might be cited here but this opinion will

now be much longer than the writer would like to have it.

It appears to us as inescapable that the above quoted pertinent provisions of the will vested in the Trustees the power and duty to take into the trust funds arising from profits, accretions or increases accruing before, at the time of, or after the death of the testatrix and to treat the same as income or principal for the purposes of distribution under the will with a view to and with the intent to make adequate provision for the life tenants and at the same time preserve, as far as compatible with this intent, the estate for the remaindermen. This provision means quite a bit more than it would have meant had the testatrix said only, "the executors and trustees in making the distribution or payments on account of the income from my estate, or from any fund created under this my last will and testament, shall have the power and authority . . . to determine in their absolute discretion what receipts should be regarded as income and what receipts shall be regarded as principal" because if she had not vested the power and authority in the trustees to regard and treat any profits, accretions or increases as income then those profits, accretions or increases which may have accrued during her lifetime would have constituted a part of the corpus of her estate at the time of her death. But by the use of the language which she did use, she included those profits, accretions and increases which might accrue during her lifetime in the estate partly at least available to the life tenants.

The doctrine of equitable income is not applicable to the fund here under consideration because of the absence of the condition of either equitable conversion

or conversion at a loss, although it may have been applicable to the home of Mrs. Burton in New York which was sold at a loss and may become applicable to other non-productive property of the estate.

In this connection Professor Scott in his work on Trusts, Vol. 2, Sec. 233.4, says:

"233.4. Unproductive Property. The trust estate may include property with respect to which the expense of holding it is greater than the income, if any, derived from it. The property may be unproductive at the time of the creation of the trust, or it may subsequently become unproductive. A common situation of this sort arises where unproductive land is included in the trust estate, either where the settler owned such land, or where the trustee has held a mortgage which he has foreclosed, buying in the land for the trust on the foreclosure sale. A similar problem arises where the trustee continues to hold a mortgage upon which the mortgagor has defaulted and the trustee is compelled to pay the carrying charges.

"Where the trust estate includes unproductive property upon which carrying charges have to be paid, two questions arise. The first is whether the carrying charges should be paid out of income, so that the beneficiary entitled to income not only receives no income from the property, but also loses a part of the income from other property which is productive, or whether such charges are payable out of principal, so that the beneficiary at least suffers no actual loss from the retention of the property. The second question is whether when the property is finally sold the beneficiary is entitled to receive a part of the proceeds as delayed income. The second question will be dealt with hereafter. We are here concerned with the

first question. Where the trustee is by the terms of
the trust directed to sell unproductive property, the
courts have had no difficulty in holding that the carry-
ing charges prior to the sale should be paid out of
principal and not out of income received from the re-
mainder of the trust property, unless a different in-
tention of the settlor appears in the trust instrument.
In such a case the direction to sell the property is
said to operate as an equitable conversion of the prop-
erty. The mere fact that the trustee postpones the
sale does not justify him in paying the carrying
charges out of income.

"On the other hand, where by the terms of the trust
the trustee is directed to retain property even though
it is unproductive, the inference is that the settlor in-
tended that as long as the property is retained the
carrying charges should be paid out of income.

"The problem is more difficult where the settlor
has made no provision wtih respect to the sale or re-
tention of the unproductive property. Thus a testator
may leave the residue of his property in trust for
successive beneficiaries and his estate may include un-
productive land. In the absence of any indication of
a different intention of the testator, the trustee should
sell the unproductive land and invest the proceeds in
income producing property. Where the sale is not
immediately made, the expense of carrying the prop-
erty should be borne by principal, not income. The
postponement of the sale is for the benefit of the
beneficiary entitled to principal as well as for the bene-
ficiary entitled to income. The fair method of dis-
tributing the burden is to let it fall upon the principal,
with the result that the beneficiary entitled to income
loses the income on the principal so expended, but is

not compelled to bear the whole burden as he would bear it if the carrying charges were paid out of income.

"It is held in a number of cases that the carrying charges incurred with respect to unproductive property are payable out of principal unless the settlor manifested a different intention. If the settlor directed the trustee to retain the unproductive property, this is a sufficient manifestion of an intention that the carrying charges should be paid out of income. If he directed the retention of the property for a specific period, this is a sufficient manifestation of intention that the carrying charges should be paid out of income during that period, but if the property is not sold within the period, the carrying charges are thereafter payable out of principal. On the other hand, where the testator directs that the unproductive property should be sold, the carrying charges are payable out of principal even though he authorizes a postponement of the sale.

"Where the trust instrument is silent on the sale or retention of the unproductive property, the better view is that the trustee is under a duty to the beneficiary who is entitled to the income to sell the property, and prior to its sale to pay the carrying charges out of principal. It would be a hardship on the life beneficiary if the retention of the unproductive property should deprive him not merely of any income from that property but should also diminish his income from other and productive property. The extent of the hardship, of course, would depend upon the amount of the unproductive property and of the carrying charges thereon, in relation to the amount of other income. It would seem, therefore, that it is

a fair inference, where the trust instrument is silent, that the testator would have intended the carrying charges to be paid out of principal if he had thought about the matter.

"In Massachusetts, however, and in some of the decisions in New York, the courts have taken a somewhat different view. They have held that the carrying charges should be paid out of principal if there is an intention shown in the trust instrument that the property should be sold, but that it is not enough that the property is unproductive and the testator has not authorized its retention. In these cases it is said that the carrying charges are to be paid out of principal only if there is an equitable conversion, and that there is no equitable conversion unless the testator has affirmatively manifested an intention that the unproductive property should be sold. In New York, however, the court has sometimes held that the carrying charges of unproductive property are payable out of principal where the settlor has authorized but not directed a sale of the property."

And in Sec. 233.5 the same author says:

"Sec. 233.5. Terms of the Trust. Where a trust is created under which the income is payable to one beneficiary and the principal is ultimately payable to another beneficiary, the respective rights of the beneficiaries may be varied by provisions in the trust instrument. By the terms of the trust it may be provided that the life beneficiary shall be entitled to more or less than the net income from the trust estate. It may be provided that the life beneficiary shall be entitled to receipts which otherwise would be retained in the trust as principal. Thus it may be provided

that he shall be entitled to any profit on the sale of trust property. The mere fact, however, that it is provided in the trust instrument that the life beneficiary shall be entitled to the 'income and profits' of the trust estate is not ordinarily sufficient to indicate an intention that he should be entitled to receive gains arising from the sale of trust property; the words 'profits' being interpreted as intended merely to be synonymous with the word 'income.' A direction to pay the 'principal sum' to the beneficiary in remainder, is not interpreted to mean that he is to get only the original principal amount, but he is entitled to the profits arising from the sale of trust property. On the other hand, it may be provided by the terms of the trust that the life beneficiary shall not be entitled to receipts which otherwise would be income and that such receipts shall be added to the principal. Such a provision is valid unless it violates a statutory rule in the State against accumulation.

"By the terms of the trust expenses which are ordinarily allocable to income may be made payable out of principal; and conversely expenses which are ordinarily allocable to principle may be made payable out of income."

Neither may the Perry plant be considered strictly as wasting property because, although it consists of a saw-mill with equipment and lands and stumpage which are deteriorating and being consumed, the record shows that the operators have consistently and continuously carried a depreciation and depletion account reserving therein an adequate fund to cover these items.

In Scott on Trusts, Vol. 2, Sec. 241.4, the author says:

"Sec. 241.4. Wasting Property. The rule as to apportionment of the proceeds of sale between income and principal is applied to wasting property, where the trustee has not received income out of which he has set aside a part as a fund for amortization. The trustee is under a duty not to pay the whole of the income from wasting property to the beneficiary who is entitled to income, but to set aside part of the income as an amortization fund or to sell the property and invest the proceeds. Wasting property consists of such interests as terminate or necessarily depreciate in course of time. It includes leaseholds, annuities, royalties, whether from books or inventions or from leases of mineral or timber lands, mines, wells, and quarries, and shares of stock in corporations owning wasting property and making no provision for amortization."

See also Sec. 236, Clause (d) Restatement of the Law of Trusts; Washington County Hospital Assn. v. Hagerstown Trust Co., 124 Md. 1, 91 Atl. 787; De Brandt v. Commercial Trust Co., 133 N. Y. Eq. 215, 166 Atl. 533. *In Re* Clark's Will, 204 574; 284 N. W. 876; Knox' Estate, 328 Pac. 177. In some of these cases the funds set up in depletion account were held to be income payable to the life beneficiaries because of the peculiar nature of the business, viz.: Sawmills and mining, while in others, for the same reasons, the entire net earnings were held to be income although no provision was made to carry a reserve for depletion.

After reviewing the record in the light of the applicable principles of law, it appears to us that acting within the purview of the powers conferred on the Trustees by the terms of the will it can not be said

that it has been made clearly to appear that the Trustees exceeded their authority in apportioning and allocating income and principal and in reaching the conclusion that the income accruing to the life tenants for the period from August 1, 1928, to December 31, 1938, amounted to $686,490.82. It, therefore, follows that the decree of the chancellor must be affirmed in this regard.

We concur in the conclusion reached by the chancellor that the charge by the Trustees of items of expense aggregating $275,695.32 against the income found to have accrued in behalf of the life tenants was not a proper or warranted charge and should not be so allowed, but should be charged against principal.

The decree is accordingly affirmed.

So ordered.

BROWN, C. J., WHITFIELD, TERRELL, CHAPMAN, THOMAS and ADAMS, J. J., concur.