William A. DUNKLEY, III, Plaintiff,

v.

PEOPLES BANK & TRUST
COMPANY, Defendant
Third Party Plaintiff,

v.

Lawrence C. RUSCHKE, Third
Party Defendant.

Civ. No. 89–3021.

United States District Court,
W.D. Arkansas,
Harrison Division.

Dec. 12, 1989.

Charles L. Harwell, Cypert, Crouch, Clark & Harwell, Springdale, Ark., for plaintiff.

Stephen W. Jones, Jack, Lyon & Jones, Little Rock, Ark., for defendant third party plaintiff.

Michael E. Kelly, Smith & Kelly, Yellville, Ark., for third party defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiff, William A. Dunkley, III, a citizen of Illinois, sued defendant, Peoples Bank & Trust Company, an Arkansas banking corporation with its principal place of business in Arkansas, in relation to certain actions taken by the defendant as trustee under a trust agreement making plaintiff one of the beneficiaries. Plaintiff contends that the trustee made payments of income and principal of the trust to another of the trust beneficiaries, Lawrence W. Ruschke, and that such distributions were not authorized by the controlling trust instrument and were contrary both to the terms of the trust agreement and applicable law. Plaintiff seeks an accounting and damages from the trustee, and for return of the trust assets allegedly wrongly distributed to Lawrence Ruschke.

Defendant bank answered and brought into the lawsuit, as a third-party defendant, Lawrence C. Ruschke, the person to whom the distributions were made. Mr. Ruschke was, at the time he was brought into the lawsuit, and still is, a resident and citizen of Wisconsin. Mr. Ruschke answered and counterclaimed against the bank, seeking an accounting and an order of the court directing the bank to distribute to him all remaining income and principal in the trust. Because there is a complete diversity of citizenship between the parties, and because the amount in controversy exceeds the jurisdictional amount established by 28 U.S.C. § 1332, the court has jurisdiction of the subject matter, and it appears that it also has jurisdiction of the parties.

### I. The Facts

On December 2, 1984, Anna T. Ruschke, the widow of William A. Dunkley, Jr. who died in 1969, married Lawrence Ruschke, a widower since 1983. The record does not reflect the age of Ms. Dunkley at that time, but it appears that Mr. Ruschke was in his mid-sixties. At the time of the marriage, Mrs. Ruschke had one adult son by her previous marriage, William A. Dunkley, III, and Mr. Ruschke had four adult sons by his previous marriage. After Anna T. Dunkley and Lawrence Ruschke met, they "dated" for less than a year and then began to discuss marriage. They both appeared to have some concern about their children and their separate estates. In his

deposition Mr. Ruschke disclosed that he talked with his attorney about "second marriages" and that "you know, the very thing that happens in second marriages is money." He says that, during a visit together in Florida where he had moved from his previous home in Illinois, she indicated that she was interested in creating trusts to protect their estates. In his deposition, Mr. Ruschke says that, "they contacted the lawyers, we went to the bank, Barnett Bank, and contacted the trust officer because she thought she wanted to go trust and I didn't think I would like trust." He went on to say that: "I heard too much bad things about trusts and I didn't want nothing to do with them. But she insisted she wanted—she'd like to have trusts." After these discussions between them, and discussions with lawyers and officers of the Barnett Banks Trust Company, N.A., they had their lawyer draft and they executed trust agreements which largely mirrored each other. Mrs. Ruschke's trust, which was received as joint exhibit 1, was dated and executed on March 11, 1985. According to a schedule of property attached to the trust agreement, Ms. Ruschke conveyed to the trustee property previously owned by her of a value of $191,735.29. The assets of the trust at the time of creation were certificates of deposits and savings accounts in various banks and savings and loan associations in excess of $137,000, cash in excess of $21,000, and mortgages of a value of in excess of $33,-000.

The trust agreement provided that upon the death of Mrs. Ruschke, her estate would be divided into two trusts, one in the name of her spouse, and the other to be known as the "family trust". The relative proportions of her estate to be placed in each of these trusts was to be determined by a formula contained in Article IV of the trust agreement which was essentially designed to minimize federal estate taxes due upon her death. It appeared that, with one possible exception, all parties agree that, because of the size of her estate on her death, a proper application of the formula contained in the trust instrument resulted in no spousal trust being created, and all of the assets of the trust after her death being held in the "family trust". During the trial, Mr. Ruschke's attorney advised the court that Mr. Ruschke did not agree that that was the case, but the court finds that a proper application of the formula contained in the trust agreement clearly causes this result.

Because it appears from the evidence at the trial that Mr. Ruschke confused and probably continues to confuse his rights granted by the spousal trust with those granted to him in the provisions in relation to the family trust, and because it is not at all clear that the trust officer of the defendant bank properly understood the differences in the rights granted by these two provisions, it is, perhaps, appropriate to explain in some detail these provisions. As is usually the case with this type of trust created to minimize federal estate taxes, the spousal trust provisions provided that the entire income would be paid to the surviving spouse, and that the surviving spouse, during his lifetime, had the right to withdraw from the trust "as much or all of the principal of the trust named for my spouse as my spouse from time to time may direct in writing." Additionally, he had the right, upon his death, to appoint by will to any person any remaining undistributed net income or principal. In other words, if a spousal trust had been created, Mr. Ruschke would have had the absolute right to take all or any part of it during his lifetime, a power that he seemed to believe he had in relation to the family trust.

However, contrary to his belief, the family trust contained very specific provisions which were, in the court's view, intended by Mrs. Ruschke to insure that Mr. Ruschke, during his lifetime, would be adequately cared for, and that any portion of her estate not necessary for that purpose would go to her son, William A. Dunkley, III.

The pertinent portions of the trust agreement in this respect are as follows:

### ARTICLE V

As of the date of my death, but after providing for the payments, if any, re-

quired by Article III of this instrument, and the allocation, if any, required by Article IV of this instrument, the trustee shall retain the balance of the trust principal (including property to which the trustee may be entitled under my will or from any other source) in a separate trust named the Family Trust. The Family Trust shall be administered as follows:

A. If my spouse survives me, then commencing as of the date of my death and during the life of my spouse, the trustee shall distribute to my spouse from time to time as much of the net income and principal of the Family Trust, even to the extent of exhausting principal, as the trustee believes desirable from time to time for the health, support in reasonable comfort, education, best interests, and welfare of my spouse, considering all circumstances and factors deemed pertinent by the trustee; provided, however, that:

1. Any undistributed net income shall be accumulated and added to the principal of the Family Trust, as from time to time determined by the trustee;

2. My primary concern during the life of my spouse is for the health and support in reasonable comfort of my spouse, and the trustee need not consider the interest of any other beneficiary in making distributions to my spouse for those purposes under this paragraph;

3. Insofar as the trustee deems it advisable, no principal of the Family Trust shall be distributed to my spouse as long as any principal remains in the trust named for my spouse.

B. If my spouse survives me, then upon the death of my spouse the trustee shall distribute all of the principal in the Family Trust as then constituted and any accrued or undistributed net income thereof, to my son, WILLIAM A. DUNKLEY, per stirpes.

### ARTICLE VI

The provisions of this Article shall apply to each trust held under this instrument:

\* \* \* \* \* \*

C. Among the circumstances and factors to be considered by the trustee in determining whether to make discretionary distributions of net income or principal to a beneficiary are the other income and assets known to the trustee to be available to that beneficiary and the advisability of supplementing such income or assets.

\* \* \* \* \* \*

F. If at any time after my death the trustee shall determine that the value of the trust is less than forty thousand dollars, the trustee, without further responsibility may (but need not) distribute the trust to the beneficiary for whom the trust is named, or, in the case of the Family Trust, to my spouse, if then living, or if my spouse is not then living, to my son, WILLIAM A DUNKLEY, per stirpes.

\* \* \* \* \* \*

### ARTICLE VII

A. The trustee shall have the following powers with respect to each trust held under this instrument, exercisable in the discretion of the trustee:

\* \* \* \* \* \*

8. To pay all expenses incurred in the administration of the trust, including reasonable compensation to any trustee, and to employ or appoint and pay reasonable compensation to accountants, depositaries, investment counsel, attorneys, attorneys-in-fact, and agents (with or without discretionary powers);

\* \* \* \* \* \*

D. The trustee's exercise or nonexercise of powers and discretions in good faith shall be conclusive on all persons. No person paying money or delivering property to any trustee hereunder shall be required or privileged to see to its application. The certificate of the trustee that the trustee is acting in compliance with this instrument shall fully protect all persons dealing with a trustee.

E. This instrument and all dispositions hereunder shall be governed by and

interpreted in accordance with the laws of the State of Florida.

At the time that their trusts were executed and established by Mr. and Mrs. Ruschke, they lived in Florida, where Mrs. Ruschke had moved after the marriage. During that time, both of the trusts were administered by the Barnett Bank, and the Ruschkes periodically received statements from that bank. Mr. Ruschke testified that they were both dissatisfied with the administration of the trust by the bank and the reports that they received.

Apparently around April of 1987, the Ruschkes moved from Florida to Mountain Home, Arkansas, where they purchased and occupied a home. Sometime prior to the death of Mrs. Ruschke in November of 1987, the Ruschkes visited with Don Defreece, the trust officer of First National Bank of Mountain Home, about moving their trusts to that bank as trustee. They told Defreece that they wanted the trusts moved to that bank so the trustee would be located near their new home. For various reasons, this was not accomplished until after Mrs. Ruschke's death and, in fact, First National Bank of Mountain Home was not appointed successor trustee until execution of the instrument received as joint exhibit 2 dated January 26, 1988. Prior to that time, trust officer Defreece had had conversations with persons in the trust department at Barnett Bank and had learned that there had been unspecified problems between Mr. Ruschke and employees of the Barnett Bank.

Mr. Defreece appears to have been well qualified for his position by education and experience. He had a Bachelor of Arts degree in business economics and approximately one and one-half years of law school. He had been a trust officer in various banks for thirteen years and had been the trust officer at Mountain Home for a period of four years. It appears that, soon after First National Bank was appointed trustee of the Anna Ruschke Trust, there were misunderstandings between him and Mr. Lawrence Ruschke. Initially these appeared to be initiated by Mr. Ruschke's misunderstanding of his power to take for himself the principal of the trust. He appeared to confuse the almost absolute power in this respect granted to him by the provisions of Article IV of the trust agreement creating the spousal trust with the much more limited rights granted by the provisions of Article V creating the family trust. According to Mr. Defreece, it was obvious that Mr. Ruschke believed that he could take any portion of the trust principal that he desired and use it for his own purposes. Mr. Defreece explained to him that the trust that his bank had agreed to administer was not the spousal trust and Mr. Ruschke did not have the power granted in that trust but instead distributions must be justified in the manner required by the provisions of Article V of the trust agreement. Those discussions, and others that evolved, appear to the court to have caused Mr. Ruschke to have a "falling out" with Mr. Defreece. Mr. Defreece testified that, after that time, he never had a discussion with Mr. Ruschke that he did not appear to be "irritated". That feeling of ill will between Mr. Defreece and Mr. Ruschke, along with what the court believes was Mr. Ruschke's desire to find a trustee that would interpret the trust the way that he wanted it interpreted, resulted in Mr. Ruschke contacting Rick Cooper, trust officer of People's Bank and Trust Company, about transferring the trust to that bank. That was accomplished by Mr. Ruschke on July 6, 1988.

Between the time that the First National Bank accepted the trust and the time that it was transferred to defendant bank, three conversations in which Mr. Ruschke was involved took place which leads the court to believe that his real motive in making the transfer was to find a trustee that would interpret the provisions of the trust instrument the way he wanted them interpreted, and would allow him to "get at" the trust principal. Shortly after the trust was transferred from Barnett Bank to First National Bank, plaintiff, William Dunkley, contacted Mr. Defreece, and he was assured that the trust would be administered according to the provisions of the trust instrument. Apparently, shortly thereafter, Mr. Ruschke called Mr. Dunkley,

Mrs. Ruschke's surviving son, and told him that his mother was now dead and that the principal of the trust now belonged to Ruschke. He told Dunkley that the administration of the trust was not Dunkley's concern and that he should "stay out of his business". Subsequently, Dunkley received a call from Ruschke asking him if he would consider a settlement in which they would agree to terminate the trust and distribute its proceeds. He asked Dunkley what he would "take" for such an agreement. Although, understandably none of the witnesses could put an exact date on these conversations, the court believes that it is probable that this conversation took place after Ruschke talked with Defreece and learned that he did not have the right under the provisions of the family trust to gain access to the principal as he apparently thought he did.

Shortly after Ruschke's and Dunkley's conversation about an agreement to distribute the proceeds, Dunkley called Defreece and told him of the conversation. Whereupon, Defreece advised Dunkley that, irrespective of any agreement between the beneficiaries, the bank would be bound to administer the trust according to the provisions of the trust agreement.

Sometime shortly after that conversation, Mr. Ruschke came into the bank and discussed with Mr. Defreece the possibility of the trust purchasing a house in the Chicago area so that Ruschke could move to Chicago to be close to his sons. He said that he needed from $90,000 to $100,000 to accomplish this, and Defreece told him that he would have to provide him with details about the proposed transaction, and he would take it to the trust committee for consideration. Defreece again discussed with Ruschke the provisions of the trust instrument and its requirements in this respect.

He heard no more from Ruschke about the proposed distribution, but instead, Ruschke began to complain about the yield that was being received by the trust on investments made by the trustee. Next, Defreece learned that Ruschke had talked with Rick Cooper at defendant bank about acting as trustee, and he then learned from Ruschke that Ruschke desired that First National Bank resign as trustee. Defreece believed, probably erroneously in view of the provisions of the trust instrument, that Ruschke had a right to remove the bank as trustee, so he agreed to the transfer. As already indicated, the trust was transferred to defendant bank on July 6, 1988.

Peoples Bank and Trust Company had a relatively small trust department run by Rick Cooper who testified at the trial. According to Mr. Cooper, the total assets of trusts administered by the bank at the time of the trial was 22.5 million dollars. Mr. Cooper is a lawyer by training, having graduated from the law school of Memphis State University in 1980. He became the trust officer of defendant bank in August of 1984, and prior to that time, had been the trust officer of a small bank in Missouri.

Although the board of directors of defendant bank had apparently adopted, or at least thought that it had adopted, the "Statement of Principles of Trust Department Management" promulgated by the Federal Deposit Insurance Corporation (FDIC), (joint exhibit 6), the manner in which the trust department was run, according to the evidence, leaves much to be desired, in the court's view. Although, as required by the FDIC statement and a similar statement promulgated by State of Arkansas bank authorities, a trust committee had been created by the board of directors of the bank to supervise the operation of the trust department, it appears that it, in reality, failed to function, or at least did not function in a manner so as to provide significant supervision of the trust department. Cooper testified that, contrary to the provisions of the FDIC statement which recommends approval by the trust committee of all "purchases, sales and changes of trust assets", he, alone, had complete power to make any decisions in this respect. He testified that he, without intervention of any other committee or person, had the power and right to approve a distribution of substantially all of the assets of a trust to one of the beneficiaries, and that his interpretation of the trust

agreement as to the bank's power and obligation in this respect was final. It appears that, at most, the trust committee would, after the fact, approve the sale or exchange of assets to make the distributions that he had decided on, after Cooper had made them and, in fact, after the sales or exchanges necessary to obtain the funds to make the distributions had already been made.

This was significant in this case, because immediately upon transfer of the trust to defendant bank, Ruschke again proceeded to attempt to obtain a large distribution of the principal of the family trust created by his deceased wife. In mid-July, after the trust had been transferred in early July, he contacted Cooper about a distribution of $140,000 to purchase a home in Chicago for "medical reasons". It appears that he had finally found someone who would interpret the trust agreement as he wished it to be interpreted, because Cooper, rather incredibly in the court's view, advised Ruschke that that was possible. He told him to bring him a letter from a doctor and a copy of the offer and acceptance on the home. Ruschke then provided Cooper with a letter dated July 22, 1989, (joint exhibit 14), from Ronald M. Crow, D.O. who, according to the letterhead, practices in Lakeview, Arkansas. In the letter, Crow, after detailing Ruschke's medical history which included a rather serious automobile accident on April 22, 1988, advised that, "I believe that it is in Mr. Ruschke's interest to return to the state of Illinois where family members reside and are more than willing to help look after Mr. Ruschke and continue nursing him back to health." He then says: "I have recommended that he move to Illinois as soon as possible, and understnd (sic) that financially this is creating a problem for him. I believe that if finances are available to help Mr. Ruschke achieve this goal, then the money should certainly be used to this end."

In addition to Crow's letter, all that Cooper had before making the distribution was an offer and acceptance on a home located in Elkhorn, Wisconsin. Mr. Ruschke had requested that Cooper distribute to him $140,000 which would reduce the principal

of the trust to approximately $38,000. The offer and acceptance presented to Cooper provided for the purchase of the Elkhorn home for $123,000. Ruschke explained to Cooper that the balance of $17,000 would be needed for moving expenses and to complete needed repairs on the home. Without any further showing whatsoever, Cooper approved the distribution of $140,000 to Ruschke, and the distribution was made by a cashier's check in that amount dated August 26, 1988, (joint exhibit 15).

At the time that Cooper approved and made the distribution, he was aware of other assets available to Ruschke. He knew that Ruschke owned a home in Mountain Home that had previously been occupied by him and Mrs. Ruschke which had a value of from $90,000 to $110,000. Additionally, Cooper was aware that, at the time the Anna Ruschke Trust was transferred to his bank, Ruschke had terminated the Lawrence Ruschke Trust created in Florida, and that the trust proceeds of that trust in the amount of $122,000 had been distributed to him. In fact, Cooper testified that he aided Ruschke in investing the proceeds of that trust at its termination. The parties stipulated that, in addition to these assets at his disposal, Mr. Ruschke drew a Borg–Warner pension and Social Security benefits of unspecified amounts.

Mr. Ruschke's contention at the trial and apparently also the contention of the defendant bank, was that the $140,000 distribution was necessary for medical reasons. It is, perhaps, significant that, according to the evidence, of the $17,000 that purportedly was to be utilized for moving expenses and home repairs, only $6,200 was claimed on Ruschke's income tax return for moving expenses for the move to Elkhorn, and little if any of the remainder of the distribution had been utilized for home repairs. According to the testimony of Mr. Ruschke at the trial, he has now conveyed the Elkhorn home purchased by the distribution of the trust assets to three of his sons by quitclaim deed.

The court believes that it is also significant that the $140,000 requested by Mr. Ruschke, and distributed by Mr. Cooper,

"just happens" to reduce the remaining principal of the Anna Ruschke Trust to less than $40,000. Article VI, Paragraph F. provides that, when the value of the trust is less than $40,000, the trustee may terminate the trust and pay the balance to Ruschke. Significantly, subsequent to receiving the $140,000 distribution, Ruschke has demanded that the remaining balance of the trust be paid to him and that the trust be terminated. In addition to the apparent oral demands made by Mr. Ruschke that the trust be terminated because of the $40,000 provision and the balance distributed to him, he made formal demand in a letter to Mr. Cooper dated December 1, 1988, (joint exhibit 27). Mr. Cooper responded on December 2, 1988, (joint exhibit 28) declining to make the distribution and concluded that: "If you are in disagreement with our reasoning, I would suggest you request we resign as Trustee and have us replaced with a Successor Corporate Trustee."

As had been his practice all along, when Mr. Cooper finally declined to accede to his every wish, Mr. Ruschke attempted to force defendant bank to resign as trustee and replace it with another trustee. Joint exhibit 29 is a letter from his attorney forwarding a document which would have replaced Peoples Bank as the trustee and substituted another trustee. Significantly, even though Mr. Ruschke was living in Wisconsin at the time, the "appointment and acceptance of successor trustee" attached to his February 22, 1989, letter would have appointed as trustee First Ozark National Bank and Trust Company of Flippin, Arkansas. Inexplicably, the document gives as the reason for the transfer that the trust "can be administered more conveniently at Flippin, Arkansas." Because of this lawsuit and the claims of Mr. Dunkley, the defendant bank has declined to resign as trustee or distribute the balance of the corpus of the trust, and Mr. Ruschke requests in his counterclaim that the court order it to make the distribution of the remaining balance and terminate the trust.

There is at least one other exhibit introduced at the trial which the court deems significant in ruling on the issues before the court. Joint exhibit 43 is a listing of Mr. Ruschke's medical expenses from the date of his automobile accident on April 22, 1988, until early August of 1989. Although the $140,000 distribution was requested by Mr. Ruschke and made by the bank for the purported reason that it was necessary because of his "ill health", it is noteworthy that joint exhibit 43 shows that, of the $24,168.70 in medical bills and expenses incurred by him during the period of time covered by that exhibit, "Medicare or other insurance" paid all but slightly over $1,000 of that amount. If Mr. Cooper did not have that information at the time the distribution was made, he could have undoubtedly obtained it for the asking.

After plaintiff Dunkley learned of the distribution, he wrote Cooper a letter dated February 17, 1989, (joint exhibit 39) and obtained a lawyer. When he received no relief, this lawsuit was filed.

## II. *The Law*

The parties agree that, in construing the provisions of the trust agreement and in determining whether the trustee breached the duties imposed by such instrument, Florida law must be applied. That is true because the settlor provided in the trust instrument that "this instrument and all dispositions hereunder shall be governed by and interpreted in accordance with the laws of the State of Florida."

Thus, even though the trust was being administered in Arkansas when the alleged breaches occurred, Florida law applies, at least in respect to construction of the instrument [1], because Ms. Ruschke provided that it should in the trust document. Courts have generally held that a provision in a trust instrument or will designating the law to be applied in construing it will

---

1. There appears to be some authority for the proposition that this is not necessarily true where the issue under consideration is whether the instrument or provisions of it are valid.

Under those circumstances, the settlor does not necessarily have a free hand in designating the law to be applied. *Scott on Trusts* § 575.

be followed, since it is the duty of the court to carry out the intent of the settlor or testator. Under those circumstances, it is not material whether the state designated has any connection with the creation or administration of the trust. V. A. Scott, *The Law of Trusts* § 575 (3d Ed.1967).

■ This court's research indicates that the law of Florida in respect to the construction of provisions such as those at issue in this case is not significantly different than the "hornbook" law on this subject which can be gleaned from almost any competent work on trusts. Courts must start with the proposition that the nature and extent of the duties and powers of the trustee are determined by the trust instrument. *Restatement, (Second) of Trusts* § 164 (1959). "Insofar as the trust instrument expressly or by implication imposes duties or confers powers on the trustee, the terms of the trust determine the extent of his duties and powers...." IIA *A. Scott & W. Fratcher, The Law of Trusts* § 164 (4th Ed.1987) (hereinafter *Scott on Trusts*). "In the administration of a trust, the discovered intent of the trustor is of controlling importance, and the trust is to be administered in the manner laid down by him." 76 Am.Jur.2d *Trusts* § 278 (1975) (Footnotes omitted).

As was stated by the author of the article in 76 Am.Jur.2d *Trusts* § 291 (footnote omitted):

> The construction of a trust instrument in respect of the powers of a trustee is governed by the rule governing the construction of trust instruments generally; the intention of the trustor is to be ascertained, due weight being given to all words used by him, and that intention is to be given effect.

*See also Scott on Trusts* § 164.1.

"It is an elementary principle in the law of trusts that in the execution of a trust the trustee is bound to comply strictly with the terms of the trust and the directions contained in the trust instrument defining his powers and duties and the extent and

limits of his authority." 76 Am.Jur.2d *Trusts* § 311 (footnotes omitted).

> In carrying out these duties:
>
> The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; and if the trustee has or procures his appointment as trustee by representing that he has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill.

*Restatement (Second) of Trusts* § 174. A similar standard of care has been adopted by the legislature of Florida and is statutorily mandated.[2] Fla.Stat.Ann. § 737.302. That statute appears to be identical to the Restatement standard, except the trustee must act as a "prudent trustee" rather than as a "prudent man" as required by the Restatement.

Courts and others writing on the duties imposed on trustees by trust instruments often attempt to categorize them as "discretionary or imperative", 76 Am.Jur.2d *Trusts* § 293, or "permissive or mandatory", *Scott on Trusts* § 187. Defendant bank contends in this case that the actions of the trustee questioned by the plaintiff involve discretionary functions and that, thus, in order to recover plaintiff must establish "that the trustee acted dishonestly, arbitrarily, from an improper motive, with gross unfaithfulness to the trust or otherwise in bad faith." For the reasons set forth below, the court does not believe that defendant's contention is supported either by the law "generally" or the law of Florida which must be applied to this case.

■ As defendant points out, it is true that *Restatement, (Second) of Trusts* § 187 says:

> Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.

*Scott on Trusts,* § 174.

**2.** For an excellent and humorous discussion of the historical development of this standard, *See*

However, comment (e) to this section explains the provision by stating:

> If discretion is conferred upon the trustee in the exercise of a power, the court will not interfere unless the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, *or fails to use his judgment, or acts beyond the bounds of reasonable judgment.*

(emphasis supplied).

The comment goes on to point out that, in a case where the trustee is authorized and directed by the trust instrument to "apply so much of the trust property as he may deem necessary for the support of the beneficiary", the court will not interfere "on the ground that the trustee has applied too large an amount, if in the exercise of his judgment honestly and with proper motives he applies an amount not greater than *a reasonable person might deem necessary for the beneficiary's support,* although the amount is greater than the court would itself have awarded". *Restatement (Second) of Trusts )*, § 187, comment (e) (emphasis supplied). Thus, the general law, as expressed in the Restatement, is that even where the trustee is exercising discretionary powers, his discretion is not unlimited. He must still act reasonably and as a reasonably prudent trustee would have acted under the same or similar circumstances. In this respect, *Scott on Trusts* § 187 explains the control that courts may exercise on the discretionary powers of trustees as follows:

> To the extent to which the trustee has discretion, the court will not control his exercise of it as long as he does not exceed the limits of the discretion conferred upon him. The court will not substitute its own judgment for his. Even where the trustee has discretion, however, the court will not permit him to abuse the discretion. This ordinarily means that so long as he acts not only in good faith and from proper motives, *but also within the bounds of a reasonable judgment,* the court will not interfere;

but the court will interfere when he acts outside the bounds of a reasonable judgment.

(footnote omitted) (emphasis supplied). This article goes on to note that the real question to be determined by the court is whether it appears from all of the evidence that the trustee is "acting in the state of mind in which it was contemplated by the settlor that he should act." (footnote omitted). In this respect it has been said that: "The fact that the trustee is a corporation, and that the discretion is given to any succeeding trustee are indicative that the discretion is not uncontrolled [3] and personal." 76 Am.Jur.2d *Trusts* § 297 (footnotes omitted).

Contrary to what defendant bank has argued throughout this proceeding, and continued to argue in its post-trial brief, the law in Florida in respect to control by the courts of "discretionary duties" is not different than that discussed above. In its post-trial brief, defendant bank contends that: "In sum, the plaintiff must establish that the trustee acted dishonestly, arbitrarily, or from an improper motive, with gross unfaithfulness to the trust or otherwise in bad faith." In support of this contention defendant cited *Griffin v. Griffin,* 463 So.2d 569 (Fla.Dist.Ct.App.1985); *Mesler v. Holly,* 318 So.2d 530 (Fla.Dist.Ct.App.1975); *Sarasota Bank & Trust Co. v. Rietz,* 297 So.2d 91 (Fla.Dist.Ct.App.1974). The court does not believe that any of the cases cited by the defendant supports this contention and, in fact, believes instead that these cases show that Florida law in respect to court control of discretionary functions is identical to that of other jurisdictions discussed above. In *Griffin, supra,* the court was faced with a trust instrument that gave the trustee "absolute discretion", a more liberal standard than that contained in the trust instrument being construed in this case. In spite of that, the Florida court recognized that such a wide grant of discretion still "does not relieve a trustee from the exercise of good faith or from being judicious in his administration of the trust," *Griffin,* 463 So.2d at

---

**3.** Citing *Viall v. Rhode Island Hospital Trust Co.,* 45 R.I. 432, 123 A. 570 (1924).

574, *quoting Mesler v. Holly*, 318 So.2d 530, 533 (Fla.Dist.Ct.App.1975). It is true that the court goes on to say that the action of the trustee in that case did not rise to the level of "willful negligence or gross unfaithfulness" justifying holding the trustee personally liable. *Griffin*, 463 So.2d at 574. However, in the court's view, by no stretch of the imagination, did that court say that a trustee, even with "absolute discretion," was liable only for willful negligence. In fact, as an indication that that is not what the court held, it goes on to say that the evidence in that case also did not show that the trustee failed "to exercise the care and skill of a prudent man in the exercise of the trust," *Griffin*, 463 So.2d at 575, *quoting, Hoppe v. Hoppe*, 370 So.2d 374, 375 (Fla.Dist.Ct.App.1978). In other words, all that the Florida court said in this case was that this particular trustee was not liable because he neither acted with "willful negligence or gross unfaithfulness" nor did he fail to "exercise the care and skill of a prudent man". It did not say that a trustee is liable only in the case of willful negligence or unfaithfulness.

*Mesler, supra,* also cited by defendant bank to support its contention, not only does not support that argument, but, instead, stands for the proposition that a grant of even "absolute discretion" does not absolve the trustee from liability for breaching his duty to act judiciously in the administration of the trust estate. The court said:

> To begin with, even though a grant of 'absolute discretion' to a fiduciary is very broad, it does not relieve a trustee from the exercise of good faith or from being judicious in his administration of the trust, which administration is always subject to review by the court in appropriate instances.

*Mesler,* 318 So.2d at 533.

The remaining case cited by defendant, *Sarasota, supra,* simply does not support defendant's contention. All that that case holds is that the trial judges and the judges of panel of the appeals court would not substitute their judgment for that of the trustee on the question of whether certain repairs should be made to the residence occupied by a life tenant. In making that statement it cites and quotes *Restatement (Second) of Trusts* § 187 already discussed above. *Sarasota,* 297 So.2d 91.

In *Hoppe v. Hoppe, supra,* the court, after discussing the holding in *Mesler,* said:

> "The manner in which a trustee performs his obligations is always subject to review by the court in appropriate instances. 76 Am.Jur.2d *Trusts* § 182 (1975). Moreover, a trustee may be held personally liable if he fails to exercise the care and skill of a prudent man in the protection of the trust."

*Hoppe,* 370 So.2d at 375, *citing Spencer v. Mero,* 52 So.2d 679 (Fla.1951).

The reason for this rule in Florida and undoubtedly most jurisdictions is expressed by a decision of the Supreme Court of Florida, *en banc,* reported in 147 Fla. 420, 3 So.2d 711 (1941). In *Wallace v. Julier,* in construing a provision in a will which granted to the executor or trustee "full power and authority" to allocate receipts to income or principal, the court was faced with the contention that it should not question the trustees exercise of this discretionary power. In response, the court said:

> The discretion which, by the terms of the Will in this case was vested in W.J. McDonald would not be interfered with or controlled by the Court so long as it is honestly and *reasonably* exercised by him. But the will does not confer an arbitrary or capricious authority. If it appears from the conduct of the trustee that he is disposing of the rents, income and profits, not in carrying out the purposes of the trust, but in selfish disregard of the claims of other beneficiaries, so that the design of the testatrix is defeated, then it is the duty of the court to interfere.

*Wallace,* 147 Fla. at 436, 3 So.2d at 717 (citations omitted) (emphasis supplied). The court goes on to say that: "The foregoing rules are necessary to the due maintenance of the principal that a trust of this character may not be defeated by the *neg-*

*ligence* or willful default of the trustee." *Id.* (emphasis supplied).

For the reasons discussed above, the court is convinced that both "hornbook law" and the law of Florida is that a trustee exercising discretionary powers, even when "absolute discretion" is granted, is still under an obligation to act judiciously, and "within the bounds of reasonable judgment" [4], and where it is determined that he has not done so, the trustee must answer for the breach of trust.

Having found that a trustee of a trust may be liable for breaches of the trust even in respect to actions which might be characterized to be "discretionary" the court must now turn to the question of what a trustee's duty is to a beneficiary such as plaintiff who has no immediate right to benefit from the trust. *Restatement (Second) of Trusts* § 232 says:

> If a trust is created for beneficiaries in succession, the trustee is under a duty to the successive beneficiaries to act with due regard to their respective interests.

*See also Scott on Trusts* §§ 183, 232.

In short, the law is that a trustee is obligated to carry out the intent of the settlor to act in a reasonably prudent manner in protecting the interest of both the immediate beneficiary of the trust and successive beneficiaries who succeed to the benefits of a trust after specified contingencies have occurred. Again, as discussed above, a court will not substitute its judgment for that of the trustee in making determinations in respect to dealing with the successive beneficiaries, but in instances where the court finds that the trustee did not act within the bounds of a reasonable judgment in making decisions in respect to the rights of successive beneficiaries, the court not only has a right but a duty to intervene to see that any such breaches of trust are redressed.

That is also clearly the law in Florida. By the enactment of Fla.Stat.Ann. § 737.303, the legislature showed that Florida has a concern for the rights of successive beneficiaries. That statute, *inter alia,* provides that, when a trustee accepts a trust, beneficiaries with vested future interests are to be notified.

As already discussed, the Florida Supreme Court, *en banc,* in *Wallace, supra,* held that, where a trustee acts in "selfish disregard of the claims of other beneficiaries, so that the design of the testatrix is defeated, then it is the duty of the court to interfere." *Wallace, supra.*

Before applying the law set forth in this part of the opinion to the facts of this case, it is appropriate to discuss one other area of the law of trusts. For the reasons to be discussed in Part III of this opinion, the court does not believe that the trust instrument in question contains an exculpatory clause relieving the trustee of liability for breaches of the trust. However, there is language in the trust agreement which the defendant bank contends exculpates it from liability for the actions taken by it in this case. Thus, it is perhaps appropriate to discuss "the law" in relation to exculpatory clauses.

*Restatement (Second) of Trusts* § 222 provides:

> (1) Except as stated in Subsections (2) and (3) the trustee, by provisions in the terms of the trust, can be relieved of liability for breach of trust.
>
> (2) A provision in the trust instrument is not effective to relieve the trustee of liability for breach of trust committed in bad faith or intentionally or with reckless indifference to the interests of the beneficiary, or of liability for any profit which the trustee has derived from a breach of trust.
>
>  \*  \*  \*  \*  \*  \*

In comments to the section, the drafters point out that the law is that exculpatory clauses must be strictly construed and that "the trustee is relieved of liability only to the extent to which it is clearly provided that he shall be excused." *Restatement (Second) of Trusts,* § 222, comment (a).

Section 222, *et seq.* of *Scott on Trusts* discusses exculpatory provisions in general, and points out that it might be appropriate

---

4. *Scott on Trusts,* § 187.

*to give exculpatory clauses purporting to relieve professional trustees from liability special scrutiny. In § 222.3 it is said:*

> It is arguable that a provision in the trust instrument relieving the trustee from liability even for ordinary negligence is against public policy. There has been of late years a growing feeling that it is improper for a professional trustee at least, who professes to give careful and skillful service to escape liability for failure to afford such service.

*Scott on Trusts*, § 222.3.

The reasoning of the court in *Tuttle v. Gilmore*, 36 N.J.Eq. 617 (1883), a case often included in text books on trust law is a vivid example of the strict construction that courts have given exculpatory clauses since the beginning of the development of the law of trusts in this country. The trust instrument in that case provided that the trustee "shall not be liable or responsible for any other cause, matter or thing except by my own willful and intentional breaches of the trust herein expressed and contained." After pointing out that some jurisdictions, even in 1883, had held that exculpatory clauses were against public policy and thus unenforceable, the court decided that in that jurisdiction the parties creating a trust could agree to limit the liability of the trustee. The court then went on to hold, that even though such clauses were valid, they should be strictly construed against the claim of no liability for actions taken by the trustee. The court then ruled:

> It is a breach of trust for the trustee to speculate with trust funds for his own gain, but it is no less a breach of trust to make unauthorized investments or take speculative risks though for the benefit of the fund and not the trustee. To do so knowingly is a willful and intentional breach of trust. In my judgment, it is a willful and intentional breach of trust within the meaning of this clause, to knowingly do any act hazarding trust funds, in violation of a duty imposed on the trustee. That this construction may leave but little force to the clause is no reason why it should not be adopted. If the intent of the parties was that the

trustee might knowingly risk and hazard the trust funds without liability, unless he intended to gain thereby, it was easy to express that intent in fitting words.

■ Thus, even if this court believed that the trust instrument in this case contained an "exculpatory clause" as that phrase has come to be understood over the years of trust law development in this country, the court would be bound to strictly construe it against the trustee, especially where the trustee is a professional trustee which, by its very existence, holds itself out to have special expertise in the matter of administration of trust estates.

### III. *The Ruling*

■ Applying the law discussed in Part II of this opinion the court has no doubt but that the trustee in this case breached its duty to administer the trust in the manner intended by Mrs. Ruschke when she executed the trust instrument and created the trust.

As indicated above, when defendant trustee accepted this trust, it agreed to administer the trust according to the intent expressed by the settlor in the trust instrument. That intent is to be gleaned from the words of the trust instrument and the circumstances surrounding its execution. In that respect it is important to note that, when they married, both Mr. and Mrs. Ruschke were "up in years". They each had separate estates and adult children by previous marriages. It is obvious from the testimony of Mr. Ruschke, especially in his deposition, that before they married they each had some concern about those separate estates and the protection of their children. Although Mr. Ruschke seemed not to want to create trusts for the purposes for which they were created, it is apparent from his testimony that Mrs. Ruschke insisted.

The evidence in this case indicates that Rick Cooper, the trust officer of defendant bank, read and relied on only one provision of the trust agreement in making the distribution of substantially all of the trusts assets to Mr. Ruschke. He placed great

emphasis on the provisions of Article V which says that, in caring for Mr. Ruschke, "the trustee need not consider the interest of any other beneficiary". He apparently failed to read the entire trust instrument or, at least, he made no attempt to determine the intent of the trustee from all of the words used, not just those selected by Mr. Cooper in making the distribution.

When the circumstances of the creation of the trust along with the words used by Mrs. Ruschke are considered, the court believes that her intention becomes clear. If she expressed it in layman's terms to her lawyers who drafted this instrument and the trustee who accepted the responsibility imposed by it, she probably said something like this:

> Lawrence and I are going to be married, and we both have a couple of concerns that we want to discuss with you. We are both 'up in years' and have children by previous marriages. We also have separate estates. We want to make certain that those separate estates don't cause problems between us and with our children after we are gone. We want to insure that, if one of us dies first, the other is properly cared for and we want to use whatever portion of our estate that is necessary to see that that occurs. However, we do not intend that the one of us who survives shall have the right to take and use all of the deceased spouse's estate without first showing a need for it. That is true because we want to have something left for our respective children when we are both gone. So I want you, the trustee, who appears to have expertise in matters such as this, to take my money and property during my lifetime and to manage it until I am gone. When I am gone, I want you to take what I have left and make certain that Lawrence is properly cared for and maintained in reasonable comfort. If it is necessary for you to use all or any part of what I have left to do that, you may do so, without worrying about my adult children, because the welfare of Lawrence during his lifetime is my primary concern. However, you will act reasonably in this respect and will not use more than is necessary to maintain Lawrence in reasonable comfort and health. This is true because I do have concern for my son and want anything not needed to care for Lawrence to go to him after Lawrence dies.

> In determining what portion if any of my money you should use to care for Lawrence, I want you to consider the other income and assets which Lawrence has of which you are aware. In other words, use any portion of what I leave to care for Lawrence if that is necessary, but do not use any of what I leave for that purpose if Lawrence is able to care for himself by using what is his.

> After we are both gone, I want any balance of my estate to go to my son, William Dunkley, III. Of course, Lawrence has made a separate trust which is identical to mine and his children will be cared for because that trust provides that any remaining portion of his estate will go to them upon the death of both of us.

> I am relying on your expertise and I assume that, since you are a bank with a trust department, I will be buying the collective judgment of the skilled officers of your bank. I expect you to use reason and common sense in doing what I have asked you to do.

The court believes that any fair reading of the entire trust agreement shows that, by executing the agreement, that is what Mrs. Ruschke told her trustee, and since that was the intention of Mrs. Ruschke, the defendant clearly breached the duty which it accepted when it became trustee.

As already indicated, there are many aspects of what occurred in this case that the court finds to be incredible, especially when it is considered that the defendant, by its very existence as a corporate trustee in a banking organization, holds itself out to have special expertise in matters such as this.

In the first place, the court finds it incredible that this organization would have allowed decisions such as the one made in this case to be made only by one individual

without any control or supervision by any other person or committee in the bank. As already indicated, the bank had a trust committee, but it did not, for all practical purposes, function. Mr. Cooper candidly admitted that he had absolute control over matters such as distributions to be made from trust estates, and that he alone could authorize a distribution which essentially took all of the assets of the trust estate, as occurred in this instance. If the trust committee even knew about this transaction, it became aware of it only after the distribution had been made and the assets converted to cash for that purpose.

■ The court is convinced that persons who hire banks to act as trustees of estates such as this one do not intend that one individual have the power that Mr. Cooper had. Instead, they believe, and have a right to believe, that the "entire bank" is working for them in providing the business judgment necessary to properly care for their life savings.

■ The manner in which this bank trust department operated is, in itself, evidence of, in the court's view, gross negligence, and what occurred in this case is a flagrant breach of the bank's duty to the trust estate and the beneficiaries of the trust. As indicated above, the trust instrument clearly directed that only so much of Mrs. Ruschke's estate as was reasonably necessary to care for Mr. Ruschke should be used by the bank for that purpose, with any amount remaining to go to the plaintiff upon the death of Mr. Ruschke. While it is true that she said that her primary concern was the care of Mr. Ruschke, that language is immediately followed by language setting forth a standard by which the bank was to determine whether distribution should be made for his care.

It is obvious that the trust instrument did not give Mr. Ruschke the right to withdraw whatever he wanted from Mrs. Ruschke's estate irrespective of the reasons for wanting it but, instead, the bank was obligated to carefully consider each request and to determine whether the requested distribution was necessary for the purposes authorized in the trust instru-

ment. It was the bank's duty to first determine whether Mr. Ruschke needed the money requested by him to maintain his health and support him in reasonable comfort, but even after that determination was made, the bank had an additional duty to determine whether that need could be met from income and assets belonging to Mr. Ruschke.

In this case, none of those determinations were made. Mr. Ruschke, after "running off" at least one other trustee because the trust officer would not agree with his interpretation of the trust, approached Rick Cooper and told him that he needed $140,000 "for medical reasons" so he could buy a house in the Chicago area. Cooper told him that was possible, because as he testified in his deposition, he believed at the time that he had no duty to any other beneficiary because of the terms of the trust instrument. After making the determination that the trust instrument authorized such a distribution, it is even more incredible that he required almost no showing of either the need for the distribution or the real purpose for it. All that he required was a letter from a doctor saying that it would be a good idea for Mr. Ruschke to be allowed to move close to his family, and an offer and acceptance showing that Mr. Ruschke intended to buy a house in Wisconsin for $123,000. For Mr. Cooper, it was sufficient for Mr. Ruschke to explain the $17,000 excess by saying that it was needed for house repairs and moving costs. No proof whatsoever of those needs was required.

With that little showing, Cooper then delivered a $140,000 cashier's check to Ruschke and he apparently used it to purchase a home which he has now deeded to three of his sons. Cooper apparently did not consider at all the fact that Mr. Ruschke had substantial funds largely of a liquid nature that could be used for this purpose. Instead, he allowed Mrs. Ruschke's estate, in spite of her attempt to control it for the benefit of her son, to be almost entirely depleted. In fact, the court believes that it is significant that the amount requested by Mr. Ruschke was just

enough to reduce the balance of the trust estate to an amount below the amount for which he could request that the trust be terminated and the balance paid to him. The court suspects strongly that Mr. Ruschke arrived at the amount of $140,000 needed because he was aware of these provisions of the trust instrument and knew that he could then demand that the trust be terminated, something he had wanted from the time the trusts were created.

All of this indicates to the court that Mr. Cooper's actions were not reasonable and that he did not, by any stretch of the imagination, act as a reasonably prudent trustee. The defendant clearly breached its trust by failing to carry out the intentions of Mrs. Ruschke as expressed by the trust instrument and is, thus, liable to the trust for its actions.

As already indicated, the trustee argues that, irrespective of how negligent it might have been, it is not liable to the trust unless it is shown that the trustee acted "dishonestly, arbitrarily, from an improper motive, or with gross unfaithfulness to the trust or otherwise in bad faith." It contends that that standard applies because Florida law requires it and because of what it believes to be exculpatory provisions contained in Article VII subparagraph (D) of the trust instrument.

For the reasons already discussed, the court does not believe that Florida law says what defendant contends that it says. Additionally, the court does not believe that this trust instrument has any provisions from which it can be determined that Mrs. Ruschke intended that the trustee would not be liable for actions of the nature taken by the trustee in this case.

It is true that the first sentence of Article VII subparagraph (D) says: "The trustees exercise or non-exercise of powers and discretions in good faith shall be conclusive on all persons." However, when subparagraph (D) is read as a whole, it becomes obvious that it deals with the question of whether third parties may safely deal with the trustee. It was not intended to exculpate the trustee from liability for actions taken by it in violation of the trust instrument.

If Mrs. Ruschke had intended for the trust instrument to contain a "exculpatory clause" within the traditional meaning of that phrase, it would have been quite simple for her attorney who drafted the instrument to include one in it for her consideration, since the textbooks and cases are replete with examples of such clauses.

For the reasons discussed in Part II of this opinion, even if this clause was intended to be an exculpatory provision, the court would be required to strictly construe it against this professional trustee. In doing so, the court would hold that an exculpatory clause, even one as broad as that contained in *Tuttle, supra,* and a multitude of other cases cited in the works discussed above, would not insulate the trustee for the grossly negligent actions taken by it in this case. Its obligations as a fiduciary fell woefully short of that expected of all trustees, especially one who holds itself out to have the expertise usually associated with trust departments of banking institutions. Florida law says that, "if a trustee has special skills, or is named as trustee on the basis of representation of special skills or expertise, he is under a duty to use those skills." (Fla.Stat.Ann. § 737.302). In the court's view, the trustee in this case did not act with the judgment and business acumen that one would expect of a layman with little business experience, and certainly not with that expected of a professional trustee with a trust officer trained as a lawyer.

### IV. *The Judgment*

That leaves for determination the judgment that should be entered in this case.

Because of the breaches of the trustee, the court will direct that the defendant make the trust whole by returning to the trust the sum of $140,000 which it wrongfully paid to Mr. Ruschke. Additionally, the trustee shall reimburse the trust for the income which it would have received on the funds wrongfully distributed between the time of the distribution and the time that the funds are returned to the trust. Such income shall be calculated at

the same rate of return being earned by the funds at the time that they were converted and distributed to Mr. Ruschke. *See generally Scott on Trusts,* § 207.1.

Both the defendant bank and the plaintiff have asked that attorney's fees be awarded, although, as the court understands the bank's position, it agrees that it would not be entitled to reimbursement for attorney's fees and other expenses in defending this lawsuit if it did not prevail. Since it did not, the bank is not entitled to an award of attorney's fees.

▆ On the other hand, plaintiff, having recovered a substantial sum for the trust, is entitled to be reimbursed for his reasonable expenses and attorney's fees incurred in the pursuit of this lawsuit on the "common fund" theory. *Shriner v. Dyer,* 462 So.2d 1122 (Fla.Dist.Ct.1984). Plaintiff will be awarded judgment for reasonable attorney's fees and is given fifteen days from the date of the judgment to be entered in this case to prove by affidavit or other appropriate means the amount of such reasonable fees and expenses.

▆ Plaintiff also contended that the bank should be required to account for and reimburse the trust for any income which the bank paid to Mr. Ruschke in violation of the trust provisions. While it is true that the trust instrument does not authorize the trustee to pay either principal or income to Ruschke without first determining that the "need" requirements discussed in detail above have been met, the court does not believe that the evidence in this case supports a finding by the court that the defendant breached its obligations imposed by the trust in making the income distributions to Mr. Ruschke. Apparently, it had been the custom throughout the administration of this trust, by two predecessor trustees, to make such payments, and the contention that they were improperly made was belatedly raised by plaintiff. The court cannot say, based on the evidence before it, that it was unreasonable for the trustee to make the modest payments of income to Mr. Ruschke, and, thus, the court does not find that it was a breach of trust for it to do so.

▆ That leaves the question of whether the bank may recover from Mr. Ruschke the distribution wrongfully made to him. *Restatement (Second) of Trusts,* § 254 states:

> If the trustee has made a payment out of trust property to one of several beneficiaries to which the beneficiary was not entitled, such beneficiary is personally liable for the amount of such overpayment, and his beneficial interest is subject to a charge for the repayment thereof, unless he has so changed his position that it is inequitable to compel him to make repayment.

The only change of circumstances present in this case is occasioned by Mr. Ruschke's conveyance of the residence purchased by a portion of the distribution to his sons. It is obvious that this conveyance was made for Mr. Ruschke's own purposes, probably to make it more difficult for the recovery of the wrongful distribution. It is certainly not "inequitable" under those circumstances to require Mr. Ruschke to return to the trust the property wrongfully distributed to him, and the judgment will include a provision directing that he return to the trust the money distributed to him.

A separate judgment will be entered contemporaneously herewith, accomplishing the above.